UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1453

DEBRA ESTEY, ET AL.,

Plaintiffs, Appellants,

v.

COMMISSIONER, MAINE DEPARTMENT OF
HUMAN SERVICES, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Morton A. Brody, U.S. District Judge]

Before

Torruella, Circuit Judge,

Bownes, Senior Circuit Judge,

and Cyr, Circuit Judge.

Patrick Francis Ende, with whom Pine Tree Legal Assistance, Inc.

was on brief for appellants.
Peter D. Coffman, with whom Jay P. McCloskey, United States

Attorney, Frank W. Hunger, Assistant Attorney General, Michael Jay

Singer and Deborah Ruth Kant, Department of Justice, were on brief for

appellee.

April 20, 1994

BOWNES, Senior Circuit Judge. Plaintiffs appeal
BOWNES, Senior Circuit Judge.

from a judgment on stipulated facts upholding a policy of the

United States Department of Agriculture (USDA) that reduces

their food stamp benefits. The district court upheld the

USDA policy of counting as income for food stamp purposes the

utility reimbursements plaintiffs receive from the Department

of Housing and Urban Development (HUD) and from the Farmers

Home Administration (FmHA). Estey v. Commissioner, Maine

Dep't of Human Servs., 814 F. Supp. 152 (D. Me. 1993).

Because we conclude that the energy-related components of HUD

and FmHA utility reimbursements are excluded by statute from

income under the Food Stamp Act, we reverse.

I.

BACKGROUND

The defendant-appellees are the Secretary of USDA

(Secretary) and the Commissioner of the Maine Department of

Human Services, the state agency charged with applying USDA's

uniform guidelines in administering the food stamp program in

Maine. Plaintiffs are a class of tenants receiving food

stamps, paying for household utilities, and living in HUD

public housing, in privately-owned "Section 8" HUD-assisted

apartments, and in privately-owned FmHA-assisted housing.1

1The class includes
[a]ll the persons in the State of Maine who will
receive or who have received FmHA and/or HUD
utility [reimbursements] anytime since March 1,
1990 and whose food stamp benefits were or will be

-2-

Plaintiffs, as tenants in HUD and FmHA housing,

receive monthly payments, called "utility reimbursements,"

because all of their utilities are not included in their

rent, and because their monthly income is very low relative

to average utility costs in their communities. The issue on

appeal is whether USDA may count utility reimbursements as

income under the Food Stamp Act, 7 U.S.C. 2011-2032,

although section 2014(d)(11)(A) of the Act expressly excludes

"energy assistance" payments from food stamp income.

A. Food Stamp Act
A. Food Stamp Act

The Food Stamp Act establishes a federally-funded,

state-administered program to alleviate malnutrition and

hunger in low income households by providing needy persons

with coupons to purchase food from retail stores. See id.

2011; Massachusetts v. Lyng, 893 F.2d 424, 425 (1st Cir.

1990); West v. Bowen, 879 F.2d 1122, 1124 (3d Cir. 1989).

USDA establishes uniform standards for food stamp

eligibility. See 7 U.S.C. 2014(b). Eligibility depends on

income. "Income" is defined as money payable to a household,

from whatever source, subject to the exclusions and

deductions in the Act. See id. 2014(d)-(e). The exclusion

wrongfully terminated, reduced, or denied because
of the defendant's policy of refusing to exclude
FmHA and/or HUD utility [reimbursements] from
"income" when determining food stamp eligibility
and benefits.
Estey, 814 F. Supp. at 154.

-3-

at issue exempts from food stamp income "any payments or

allowances made for the purpose of providing energy

assistance under any Federal law." Id. 2014(d)(11)(A).

Plaintiffs, as recipients of FmHA and HUD utility

reimbursements, are allotted fewer food stamps because USDA

interprets the Act to include utility reimbursements as

income.

B. HUD and FmHA Utility Reimbursements

To frame an analysis of whether utility

reimbursements are "energy assistance" under the Food Stamp

Act, we outline the regulations on utility reimbursements

under the FmHA rental assistance program and the HUD section

8 and public housing programs. In relevant respects, these

regulations are identical. Tenants in HUD and FmHA housing

pay no more than 30% of household income for rent plus an

allowance for any utilities not supplied by the landlord.

See 42 U.S.C. 1437a(a)(1); 7 C.F.R. pt. 1930, subpt. C,

exhs. B.IV.A.2.c, E.II.E. Water, sewerage, trash collection,

electricity, cooking fuel, heat, and hot water are utilities

for which allowances may be established. See 24 C.F.R.

813.102, 965.472, 965.476; 7 C.F.R. pt. 1944, subpt. E, exhs.

A-5, A-6. The FmHA utility allowance reflects the utility

costs incurred by the majority of households in similar units

in a housing complex. See 7 C.F.R. pt. 1944, subpt. E, exh.

A-6.I, -6.II. HUD utility allowances represent a "reasonable

-4-

consumption" of utilities "by an energy-conservative

household of modest circumstances consistent with the

requirements of a safe, sanitary and healthful living

environment." 24 C.F.R. 813.102, 965.476(a).

To prevent tenants who pay for their own utilities

from generally incurring excessive utility costs, HUD and

FmHA regulations permit rent (capped at 30% of income) to be

offset by an allowance for utilities. See 24 C.F.R.

813.102, 913.102; 7 C.F.R. pt. 1930, subpt. C, exh. E.IX.A.1.

This set off results in a payment called a "utility

reimbursement" whenever monthly income is very low and

utility costs are relatively high. A utility reimbursement

is equal to the sum of all allowances for any utilities not

supplied by the landlord minus 30% of monthly income. See 24

C.F.R. 813.102, 913.102; 7 C.F.R. pt. 1930, subpt. C, exh.

E.IX.A.2.

For example, if a tenant's monthly income is $100,

$30 (30%) is the total amount the tenant must pay for housing

costs, including any utility allowance. If the utility

allowance is $5, the tenant will not receive a utility

reimbursement, but will owe the landlord only $25 because the

allowance is credited against the total amount due. A tenant

with the same monthly income, but with a utility allowance of

$50, will pay the landlord no rent and will receive a utility

reimbursement of $20 (the utility allowance minus 30% of

-5-

$100). Every tenant entitled to a utility reimbursement

receives a bill from at least one utility company. The

reimbursement ensures that FmHA and HUD tenants, living in

very poor households, will not generally pay more than 30% of

household income for energy, water, sewerage, and trash

collection costs.

II.

DISCUSSION

Plaintiffs argue that utility reimbursements are

"energy assistance," and that section 2014(d)(11)(A) of the

Food Stamp Act exempts such assistance from income

calculations. USDA contends that this provision, excluding

from food stamp income "any payments for the purpose of

providing energy assistance," is inapplicable because "energy

assistance" is limited to payments made to offset rapidly

rising energy costs, whereas utility reimbursements cover

routine utility costs.2

2Courts have split over whether USDA may count utility
reimbursements as income. See, e.g., West v. Bowen, 879 F.2d

1122 (3d Cir. 1989) (striking down USDA's policy); accord

South Dakota Dep't of Soc. Servs. v. Madigan, 824 F. Supp.

1469, 1477 (D.S.D. 1993), appeal docketed, Nos. 93-2849, 93-

2869 (8th Cir. July 21 & 23, 1993); Carpenter v. North

Carolina Dep't of Human Res., 419 S.E.2d 582 (N.C. Ct. App.

1992). Contra Gore v. Espy, Nos. 2:91-0139, 2:91-0826

(S.D.W.V. March 31, 1993); Scott v. Grunow, No. 1:90-0188

(M.D. Tenn. May 22, 1992); Susan v. Scales, No. S-91-65M

(N.D. Ind. May 19, 1992); Garcia v. Madigan, No. H-91-1992

(S.D. Tex. Nov. 29, 1991); Larry v. Yamauchi, 753 F. Supp.

784 (E.D. Ark. 1990); Mitchell v. Block, No. 82-3297-3

(D.S.C. June 22, 1983); Orr v. Arizona Dep't of Econ. Sec.,

761 P.2d 1085 (Ariz. Ct. App. 1988). Cf. Maryland Dep't of

-6-

A. Standard of Review

A court reviewing an agency's interpretation of a

statute it administers must first determine whether Congress

has spoken to the "precise question at issue." Chevron

U.S.A. v. Natural Res. Defense Council, 467 U.S. 837, 842

(1984). The precise question in this case is whether "energy

assistance" under section 2014(d)(11)(A) encompasses only

payments offsetting rapidly rising energy costs. Cf. id. at

840, 845 (noting that precise question at issue is whether

EPA's plantwide definition of "stationary source" applies to

a statute requiring permits for new or modified stationary

sources of air pollution). If Congress's intent on this

question is clear, "that is the end of the matter; for the

court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress." Id. at 842-43.

Our review of the district court's construction of the

statute is de novo. See Lyng, 893 F.2d at 428.

In determining congressional intent, we employ the

traditional tools of statutory construction, including a

consideration of the language, structure, purpose, and

history of the statute. See Dion v. Commissioner, Maine

Dep't of Human Servs., 933 F.2d 13, 15 (1st Cir. 1991). Our

inquiry begins with an examination of the relevant statutory

Human Res. v. USDA, 976 F.2d 1462 (4th Cir. 1992) (upholding

USDA's interpretation of exclusion for energy assistance
provided under state or local laws).

-7-

language. American Tobacco Co. v. Patterson, 456 U.S. 63, 68

(1982). To be excluded from income under section

2014(d)(11)(A), a payment must be "for the purpose of energy

assistance." The Act provides no definition for "energy

assistance," but its meaning is generally understood. A

payment that provides "assistance" commonly refers to a

public subsidy; for example: housing assistance, rental

assistance, and medical assistance payments. We assume

"`that the legislative purpose is expressed by the ordinary

meaning of the words used.'" American Tobacco Co., 456 U.S.

at 68 (citation omitted). In the absence of a manifestation

of legislative intent to the contrary, we conclude that

"energy assistance" means what it says: a public subsidy for

the purchase of energy.

Under this plain reading of the provision, the

plaintiffs have no colorable claim unless their utility

reimbursements are subsidies for energy. FmHA and HUD

utility allowances account for nonenergy utilities such as

water, sewerage, and trash collection, as well as energy

utilities including heat, electricity, natural gas, and hot

water. A tenant directly liable for certain utilities

receives a utility reimbursement only if the sum of the

allowances for these utilities exceeds 30% of household

income. Therefore, a utility reimbursement does not

subsidize energy purchases unless the tenant pays at least

-8-

one energy company for the services provided. Otherwise, a

utility reimbursement is not an energy subsidy at all because

it assiststhe tenantonly inpaying nonenergyutility providers.

In response to the Secretary's argument that

utility reimbursements can never be energy assistance because

they might offset nonenergy utility costs, plaintiffs contend

that utility reimbursements are always energy assistance

because they are intended "primarily" for the payment of

energy bills. A committee report discussing the energy

assistance exclusion states that benefits provided by the

Home Energy Assistance Act, and the Energy Crisis

Intervention and Energy Crisis Assistance Programs, are

"energy assistance." See H.R. Rep. No. 788, 96th Cong., 2d

Sess. 122-23 (1980), reprinted in 1980 U.S.C.C.A.N. 843, 955-

56. Because these programs historically provided food,

medicine, and rental assistance, as well as direct subsidies

for fuel bills, plaintiffs contend that Congress did not

intend "energy assistance" to include payments only for

energy utilities.

Plaintiffs fail to acknowledge the difference

between their utility reimbursements and the benefits

provided under the programs discussed in the House Report.

According to the report, these programs provided assistance

to offset the impact of high energy costs. See id.; see also

45 C.F.R. 1061.51-6(a), 1061.70-8. At issue in this case,

-9-

however, are utility reimbursements that are designed in part

to offset nonenergy utility costs. The analogy suggested by

plaintiffs is thus not apt; it does not clarify whether

payments designed to account for a mixture of energy and

nonenergy expenses are "energy assistance." Neither the

energy assistance exclusion's plain language, nor its

legislative history evince an intent to exclude payments

provided primarily for the purpose of energy assistance. For

this reason, we decline plaintiffs' invitation to read the

word "primarily" or its equivalent into the statute.

The Secretary argues that a utility reimbursement

can never be a subsidy for the purchase of energy because the

allowance may be based exclusively on nonenergy utility

costs. In all likelihood, however, part of every tenant's

utility reimbursement is based on an energy-related utility

allowance. In fact, some tenants receive utility

reimbursements only for energy utilities. Named plaintiff

Felix St. Peter's utility reimbursement, for example, is a

two party check made jointly payable to him and Maine Public

Service Company. See 24 C.F.R. 813.108, 913.108

(providing that HUD utility reimbursements may be made

payable to utility providers). The energy and nonenergy

components of a utility allowance are itemized when the

allowance is approved by FmHA and HUD; this information may

be used to determine what fraction of a utility reimbursement

-10-

is energy-related. FmHA regulations require a landlord to

list each utility allowance separately when seeking FmHA

approval for the allowance, and to provide this information

to the tenant. 7 C.F.R. pt. 1944, subpt. E, exh. A-6.III to

-A.6.V. The local public housing agency operating a HUD

public housing project must maintain similar lists of utility

allowances, and this information is available to the tenant.

24 C.F.R. 965.473, 965.474. Although HUD regulations for

section 8 privately-owned housing do not explicitly require

that itemized information on utility allowances be retained

for the tenant, this is the implication of regulations

requiring that HUD or the local public housing agency approve

proposed allowances and that allowances be reviewed annually

for adjustments. See, e.g., id. 813.102, 882.116,

882.214. We assume that HUD and the local public housing

agency would retain records of utility allowances and would

make this information available to the tenant whose rent

depends on that allowance.

Such information may be used to determine how much

of a utility reimbursement is in fact a subsidy for energy

costs. See South Dakota Dep't of Soc. Servs., 824 F. Supp.

at 1477 ("computing the energy and non-energy components of

[utility reimbursements] would be a simple matter of

arithmetic, not a great administrative burden"). If 60% of a

utility allowance is attributable to energy costs, then 60%

-11-

of the utility reimbursement is a payment assisting the

purchase of energy. According to a construction of the

statute consistent with its plain language, only 40% of the

reimbursement may be counted as income under the Food Stamp

Act.

-12-

B. Structure of the Act: Deductions and Exclusions

Turning to an analysis of the structure of the Act,

we consider whether reading the energy assistance exclusion

in context renders counter-intuitive or ambiguous Congress's

intent on the meaning of "energy assistance."

The Secretary argues that the structure of the Food

Stamp Act indicates that utility reimbursements are not

"energy assistance." Income eligibility determinations for

food stamps resemble income tax calculations, see Department

of Health & Welfare v. Block, 784 F.2d 895, 900 (9th Cir.

1986); that is, net food stamp income equals gross income,

minus any payments that are excluded by statute, minus the

standard deduction and any other deductions applicable to the

household. The Food Stamp Act's "standard deduction" and

"excess shelter cost deduction" account for utility costs.

See 7 U.S.C. 2014(e). According to the Secretary,

excluding utility reimbursements as "energy assistance" would

subtract utility costs twice: once as an exclusion and again

as a deduction.

The argument that a payment may not be excluded

because it offsets a cost already accounted for by the

standard deduction is not persuasive. All households,

regardless of size, receive the standard deduction, which

only in the most general sense reflects energy utility costs,

just as it reflects many other costs. The standard deduction

-13-

is a fixed sum that is adjusted annually according to the

Consumer Price Index "for items other than food and the

homeowners' costs and maintenance and repair component of

shelter costs." 7 U.S.C. 2014(e).

The deduction for excess shelter costs specifically

accounts for energy utilities, but it does not capture the

entire cost of energy utilities. The statute allows a

household to deduct shelter expenses, including rent and

utilities, only "to the extent that the monthly amount

expended by [the] household for shelter" exceeds 50% of the

household's income after all other deductions have been

taken. Id. Deductible expenses include rent, property

taxes, property insurance, and mortgage payments and

interest, as well as fuel, electricity, water, sewerage,

trash collection, and telephone service. See 7 C.F.R.

273.9(d)(5)(ii). The cap on the deduction is adjusted to

reflect changes in the Consumer Price Index for the shelter,

fuel, and utilities components of housing costs. 7 U.S.C.

2014(e).

According to the Secretary, Congress could not have

intended to exclude the energy component of utility

reimbursements, given the existence of the excess shelter

cost deduction. But the Secretary does not offer an

alternative construction of the Act that absolutely precludes

deducting energy utility costs whenever energy assistance

-14-

payments are excluded from income. Even if the energy

assistance exclusion were intended to cover only payments

offsetting rising energy costs, as USDA contends, any

payments designed to offset rising energy costs would be

excluded, while the energy costs themselves would be

deductible. Implicit in any construction of the energy

assistance exclusion is that Congress intended energy

assistance to be excluded and energy utility costs to be

deducted, to the extent that all shelter costs exceed 50% of

monthly income. This is borne out in the legislative history

of the energy assistance exclusion: "If a household receives

an energy allowance or grant, that allowance or grant is not

to be included in income at all, but the energy costs which

it covers may continue to be treated as a potentially

deductible shelter expense when billed or due." H.R. Rep.

No. 788, supra, at 123, 1980 U.S.C.C.A.N. at 956.

As a practical matter, there is unlikely to be a

substantial overlap between households excluding the energy

component of utility reimbursements and those deducting

excess shelter costs. Tenants receiving utility

reimbursements pay no rent and incur no homeowners' expenses.

They are entitled to the excess shelter cost deduction only

to the extent that their utility costs alone exceed half of

their monthly income, including the nonenergy component of

-15-

their utility reimbursements.3 In other words, the poorest

food stamp recipients living in public housing would exclude

the energy component of their utility reimbursements, then

deduct the fraction of their utility bills exceeding half of

their income. This result is consistent with the Act's

purpose to alleviate hunger and malnutrition by augmenting

the food purchasing power of participating low-income

households. See 7 U.S.C. 2011. We do not find that the

structure of the Food Stamp Act requires that the energy

assistance provision be construed contrary to its plain

language. Our reading of the provision in context reinforces

our determination that the plain language manifests

Congress's intent.

C. Legislative History

3For administrative convenience in calculating the excess
shelter expense deduction, a "standard utility allowance"
(SUA) may be used in lieu of a household's actual utility
costs. 7 C.F.R. 273.9(d)(6). Households receiving "energy
assistance" may use the SUA only if they incur "out-of-
pocket" heating or cooling expenses. 7 U.S.C. 2014(e).
The Third Circuit, having previously found impermissible the
USDA policy of counting utility reimbursements as income, see

West, 879 F.2d at 1132, subsequently upheld a USDA policy

preventing recipients of utility reimbursements from using
the SUA unless their actual utility costs exceeded their
public housing utility allowances, see West v. Sullivan, 973

F.2d 179 (3d Cir. 1992), cert. denied, 113 S. Ct. 2934

(1993). Plaintiffs argue that they may use the SUA, even if
their utility reimbursements are energy assistance, because
they must pay 30% of household income for utilities. We do
not address this argument because it is not an issue in this
case.

-16-

We next consider the legislative history of the

energy assistance exclusion, to determine whether the

legislative intent we find clearly expressed in the statutory

language is clouded or contradicted by any statements of

members of Congress.4 When the exclusion was enacted in

1980, the House Committee on Agriculture issued a report

noting that certain energy grants and allowances, designed to

offset the rising cost of energy, had been excluded from food

stamp income calculations in prior years by express

provisions in other statutes. H.R. Rep. No. 788, supra, at

122, 1980 U.S.C.C.A.N. at 955. The report cites examples of

energy assistance programs that were designed to offset the

rise in energy costs in the late 1970s and in 1980, id. at

121-22, 1980 U.S.C.C.A.N. at 954-55, and notes that the

exclusions for assistance provided under these programs

ensured that food stamp recipients would be held "harmless"

for their benefits. Id. at 122, 1980 U.S.C.C.A.N. at 955.

Preferring that amendments to the Food Stamp Act be

made under its aegis, the committee drafted the energy

assistance exclusion, which "incorporate[s] the essence" of

these prior exclusions. Id. The committee stated that the

4We reject the parties' invitation to delve into the language
and legislative history of the Housing and Community
Development Reauthorization Act of 1992, Pub. L. No. 102-550,
927, 106 Stat. 3672, 3885-86 (1992). That statute
addresses neither how utility reimbursements should be
treated under the Food Stamp Act, nor the proper
interpretation of the energy assistance exclusion.

-17-

provision would exclude "all energy assistance provided

households through the use of Federal, State, or local funds

flowing from . . . laws that focus on the problem of energy

assistance." Id. at 123, 1980 U.S.C.C.A.N. at 956. The

committee further stated that the provision would "exclude

from income any direct payments made to households by the

Federal Government" under "crisis intervention" or "regular

energy assistance" programs. Id. This aspect of the

committee report does not define "energy assistance," but

does indicate that section 2014(d)(11), by incorporating the

essence of similar, program-specific provisions in other

statutes, was intended to exclude "any" payments providing

energy assistance under "any" federal law.

The committee report further states:

Where energy assistance provided

households through the use . . . of

Federal, State, or local funds flowing

from Federal, State, or local laws not

specifically dealing with energy

assistance is concerned, such as Aid to

Families with Dependent Children or

General Assistance, the Committee also

intends to guarantee excludability

provided that [USDA] is satisfied that

the increase in benefits awarded by the

State or local government (either on a

matching basis with the Federal

Government or on its own) is, in fact, an

energy assistance-related increase and

not simply a general welfare increase

that would have occurred even were energy

costs not a factor and that, therefore,

should be viewed as income for food stamp
program purposes. Only where energy

costs are a but-for cause of the

increased payment should the payment be

-18-

excluded from income and, then, only to

the extent that the increase is

attributable to high heating costs rather

than general inflationary conditions.

The Committee obviously expects that
State legislatures and local councils
will . . . not take advantage of this
exclusion by labeling every . . . regular
welfare allotment adjustment an energy
assistance increase in order to take
advantage of this exclusion . . . .

Id. (emphasis added).

The Secretary argues that the highlighted

statements support a narrow definition of "energy assistance"

for the purpose of section 2014(d)(11)(A). Our scrutiny of

the context, however, leads us to conclude that these remarks

were prompted by the concern that state and local governments

might pass off increases in existing, nonenergy-related

welfare program payments as "energy assistance." See

Maryland Dep't of Human Res., 976 F.2d at 1470-71. Because

the federal government pays the entire cost of food stamp

benefits, 7 U.S.C. 2013(a), such a ploy would increase the

allotments of food stamps to a state's residents at no

substantial cost to the state. To thwart such efforts,

Congress subsequently amended the exclusion for energy

assistance payments provided under state and local laws.5

5Section 2014(d)(11)(B) excludes from food stamp income,
any payments or allowances made for the
purpose of providing energy assistance .
. . under any State or local laws
designated by the State or local
legislative body authorizing such
payments or allowances as energy

-19-

See Maryland Dep't of Human Res., 976 F.2d at 1471. Utility

reimbursements, in contrast, are provided under federal

regulations that specify that the payments account for energy

and nonenergy utility costs. Although we do not dispute that

the committee intended that "energy assistance" include

benefits offsetting the rising cost of energy, the

legislative history of the provision reveals no intent to

circumscribe the plain language of the provision so that it

would apply only to such benefits.

Furthermore, we note that the Secretary's

interpretation of the energy assistance exclusion causes a

result at odds with the legislative history. The 1980 House

Report indicates that typical energy assistance programs

"hold low-income households harmless by permitting them to

buy the same amount of energy they would have utilized in

past years without having to diminish their already marginal

assistance, and determined by the
Secretary to be calculated as if provided
by the State or local government involved
on a seasonal basis for an aggregate
period not to exceed six months in any
year even if such payments or allowances
(including tax credits) are not provided
on a seasonal basis because it would be
administratively infeasible or
impracticable to do so.

Unlike the exclusion for federal energy assistance, this
statute expressly provides the Secretary a role in
determining whether payments designated by state or local
governments as "energy assistance" should be counted as
income.

-20-

incomes." H.R. Rep. No. 788, supra, at 122, 1980

U.S.C.C.A.N. at 955. An exclusion for such assistance,

according to the House Report, guarantees that low-income

households are held harmless for the assistance they receive.

Id. Utility reimbursements with energy components are

designed in part to ensure that tenants, on average, will be

able to purchase energy utilities without spending more than

30% of household income. The allowances underlying these

reimbursements are adjusted annually to reflect substantial

energy cost increases. See, e.g., 7 C.F.R. pt. 1930, subpt.

C, exh. E.IX.C; 24 C.F.R. 882.214, 965.478. In this

manner, utility reimbursements ensure that a household's

expenditures for energy remain constant as a percentage of

household income, from year to year. USDA's practice of

counting the energy component of utility reimbursements as

income does not hold tenants "harmless" for the assistance

they receive.

The Secretary argues that Congress ratified USDA's

interpretation of the statute when it amended the energy

assistance exclusion in 1988. Prior to 1988, section

2014(d)(11)(A) exempted from income "any payments or

allowances made under any Federal law for the purpose of

providing energy assistance." See West v. Bowen, 879 F.2d at

1130. Congress reworded the statute in 1988 so that the

provision currently excludes "any payments or allowances for

-21-

the purpose of providing energy assistance under any Federal

law." A Senate committee report indicates that this

"technical amendment" clarified

that USDA and local agencies do not need
to conduct an inquiry into the purpose of
a federal statute before excluding
federal "payments for the purpose of
energy assistance." The law as now
written could be read to require this
analysis.

The crucial question should be whether
the purpose of the payment is energy
assistance, not whether the statute, as a
whole, is primarily for energy assistance
or includes other human services as well.
This change is not intended to change

current policy.

S. Rep. No. 397, 100th Cong., 2d Sess. 28-29, reprinted in

1988 U.S.C.C.A.N. 2239, 2266-67 (emphasis added).

The Secretary urges us to read the last sentence in

the quoted text as endorsing the agency's policy of

restricting the definition of energy assistance solely to

payments offsetting dramatic increases in the cost of energy.

The problem with the Secretary's argument is that USDA's

policy of applying the exclusion only to payments offsetting

dramatic increases in the cost of energy did not exist at the

time the Senate Report was drafted. Although USDA treated

utility reimbursements as income before 1988, the agency

based this practice on the faulty interpretation of the

energy assistance exclusion that the 1988 amendment was

designed to correct. The two cases construing the statute

-22-

prior to 1988, West v. Bowen, No. 84-3883 (E.D. Pa. Dec. 17,

1987), rev'd, 879 F.2d 1122 (3d Cir. 1989) and Mitchell v.

Block, No. 82-3297-3, slip op. at 10 (D.S.C. June 22, 1983),

held, consistent with USDA's interpretation at that time,

that utility reimbursements are not "energy assistance"

because they were authorized by federal housing laws, rather

than energy assistance laws.6

Viewed in this light, the plaintiffs'

interpretation of the 1988 amendment and the Senate Report is

more persuasive: the amendment was not intended to change

congressional policy, but in effect it repudiated the

agency's litigation position by clarifying that any payments

for energy assistance be excluded, regardless of the purpose

of the law authorizing the payments. Further support for

this interpretation is that the committee described the

rewording of the statute as a "technical amendment." The

statement in the legislative history that the amendment "is

not intended to change current policy" reaffirms that it is

not a substantive revision of the statutory language.

The Secretary's final argument based on the

legislative history is that Congress expressed tacit approval

of USDA's interpretation by leaving it in place when it

6The district court in Mitchell cited the legislative history

of the energy assistance exclusion as an alternate basis for
upholding the practice of counting utility reimbursements as
income. See Mitchell, No. 82-3297-3, slip op. at 13-28.

-23-

amended the statute in 1988. Inaction may signify

acquiescence to an agency interpretation. See, e.g., Bob

Jones Univ. v. United States, 461 U.S. 574, 600-01 (1983). A

logical prerequisite to inferring approval or ratification

from silence is that the agency's interpretation antedates

any relevant amendments. That is not so here. Although USDA

has invariably deemed utility reimbursements to be income

under the Food Stamp Act, the agency's rationale for this

practice has changed over time. Prior to the 1988 amendment

of the Act, the agency asserted in litigation that the

exclusion applied only to payments made under federal laws

specifically enacted to provide energy assistance. The 1988

amendment condemned this interpretation, see West v. Bowen,

879 F.2d at 1322, and the agency abandoned it in favor of the

position it espouses in this case, that "energy assistance"

refers only to payments offsetting rapidly rising energy

costs. The interpretation of the statute at issue on appeal

thus does not predate the 1988 amendment.

We have considered USDA's unvarying treatment of

utility reimbursements as an "interpretation" of the statute

capable of ratification by silence, but we do not find great

significance in Congress's inaction. "Congressional inaction

frequently betokens unawareness, preoccupation, or

paralysis." Zuber v. Allen, 396 U.S. 168, 185-86 n.21

(1969). Legislative silence is most significant when the

-24-

"area is one of traditional year-by-year supervision, like

tax, where watchdog committees are considering and revising

the statutory scheme." Id. In the baker's dozen years that

have passed since the Food Stamp Act energy assistance

exclusion was enacted, the Act has been amended many times,

but the exclusion itself has been amended only twice. The

1981 amendment affected only the provision excluding state

and local energy assistance payments. The legislative

history of the 1988 amendment reflects a senate committee's

appreciation that USDA misread the statute, but does not

indicate the committee's awareness of USDA's treatment of

utility reimbursements. See S. Rep. No. 397, supra, at 28,

1988 U.S.C.C.A.N. at 2266 (stating that "USDA and local

agencies do not need to conduct an inquiry into the purpose

of a federal statute before excluding" energy assistance).

Therefore, even if what the senate committee recognized about

the agency's prior misreading of the statute were

attributable to the entire Congress, this would not prove

congressional cognizance of the treatment of utility

reimbursements.

There are still fewer facts outside the legislative

history supporting an inference of congressional awareness.

USDA has not embodied its interpretation of the federal

energy assistance exclusion in a regulation. Moreover, our

research uncovered nothing suggesting that the agency

-25-

embodied its position on utility reimbursements in any agency

publication prior to 1990, when it issued policy statements

on the matter. And the only courts considering USDA's

treatment of utility reimbursements prior to 1988 issued

unpublished opinions. E.g., West, No. 84-3883; Mitchell, No.

82-3297-3. Furthermore, the policy of including utility

reimbursements in food stamp income affects only very poor

FmHA and HUD tenants, persons unlikely to have the resources

to publicize their plight. We cannot infer from the

legislative history and from these facts that congressional

silence signals ratification of the agency's policy. Nor do

we find in the legislative history any statements belying our

determination that Congress's intended meaning for the energy

assistance exclusion is manifested by its plain language.

D. Deference

The Secretary argues that we must defer to the

agency's judgment on the applicability of the energy

assistance exclusion to utility reimbursements because this

authority has been expressly delegated to the agency.

According to the Secretary, Congress explicitly called on

USDA to determine whether any payments provided under federal

"laws not specifically dealing with energy assistance" were

"energy-assistance related." H.R. Rep. No. 788, supra, at

123, 1980 U.S.C.C.A.N. at 956. An agency's reasonable

construction of a statute is entitled to deference when

-26-

Congress delegates to the agency the power to interpret the

statute. See St. Luke's Hosp. v. Secretary of Health & Human

Servs., 810 F.2d 325, 331 (1st Cir. 1987).

We previously quoted the passage from the House

Report cited by the Secretary in support of this argument,

see H.R. Rep. No. 788, supra, at 123, 1980 U.S.C.C.A.N. at

956, and we noted that the remarks reflected the committee's

concern that state or local governments might pass off

increases in general welfare as energy assistance. Utility

reimbursements, in contrast, are authorized by federal

regulations specifying that the payments account for energy

utility costs. The legislative history cited by the

Secretary does not empower USDA to refine the energy

assistance exclusion so that it does not apply to the energy

component of a utility reimbursement. Finally, the

Secretary contends that USDA's policy should be upheld

because, under Chevron, courts must defer to an agency's

reasonable interpretation of a statute it administers.

Chevron prescribes that courts employ a two-step analysis of

an agency's interpretation of a statute it administers. See

Dion, 933 F.2d at 14-15. Deference is appropriate only when

the legislative intent is unclear. See St. Luke's Hosp., 810

F.2d at 331. In this case, the plain language of the statute

manifests Congress's intent on the question at issue: any

payment designed to offset energy costs is excluded from food

-27-

stamp income, not just payments offsetting rapidly rising

energy costs. We conclude that the energy component of a HUD

or FmHA utility reimbursement, as a subsidy for the purchase

of energy, must be excluded from food stamp income

calculations. Any policy of USDA to the contrary is

impermissible.

The decision of the district court is therefore

Reversed.
Reversed.

Dissent follows.

-28-

CYR, Circuit Judge (dissenting). Although the court
CYR, Circuit Judge (dissenting).

proposes a plausible alternative, I cannot agree that the

Exclusion 11 interpretation adopted by the United States

Department of Agriculture ("USDA") is "arbitrary, capricious, or

manifestly contrary to the statute." Chevron U.S.A., Inc. v.

National Resource Defense Council, 467 U.S. 837, 844 (1984). Not

only are statutory interpretations by an administering agency

entitled to deferential review, id., but the rationale underlying

the Chevron doctrine is fully implicated in this case. I would

therefore accord Chevron deference to USDA's interpretation of

the pivotal language "energy assistance [payments]," as excluding

ordinary utility reimbursements ("URs").

First, the omnibus regulatory scheme established under

the Food Stamp Act ("FSA") is "technical and complex" both in its

literal statutory manifestation and in its interdependent

implementation with several elaborate federal and state public

assistance statutes administered by other agencies (e.g., HUD and

FmHA). See id. at 865; Maryland Dep't of Human Resources v.

United States Dep't of Agric., 976 F.2d 1462, 1470 (4th Cir.

1992). As a consequence of its accustomed immersion in the

intricacies of the FSA, and its intimate familiarity with related

statutory schemes, the USDA, like other administering agencies,

ordinarily is presumed to have the confidence of Congress in

affording interstitial interpretations of statutes entrusted to

its administration. See Chevron, 467 U.S. at 865 ("Judges are

-27-
27

not experts in the field . . . ."); Sierra Club v. Larson, 2 F.3d

462, 468-69 (1st Cir. 1993); Aronson v. IRS, 973 F.2d 962, 965

(1st Cir. 1992); Evans v. Commissioner of Maine Dep't of Human

Servs., 933 F.2d 1, 7 (1st Cir. 1991). Further, as a politically

accountable executive agency, generally speaking the USDA should

be left to "strike the [policy] balance" not struck by Congress,

and to reach "a reasonable accommodation of manifestly competing

interests." Chevron, 467 U.S. at 865-66 (emphasis added). The

policy choices plainly implicated by the FSA's provisions on

income inclusion and exclusion, and Congress's repeated failure

to countermand USDA's longstanding policy favoring inclusion of

URs, see Zemel v. Rusk, 381 U.S. 1, 12 (1965), present a textbook

case for Chevron deference. Lastly, ever since 1980, after

considering Exclusion 11 and its legislative history "in a

detailed and reasoned fashion," Chevron, 467 U.S. at 865, the

USDA consistently has concluded that Congress did not intend to

insulate food stamp recipients from energy cost increases that

routinely accompany inflationary rises in the nature of "normal

household living expenses." 7 C.F.R. 273.9(c)(5) (1993).

I readily acknowledge, of course, that Chevron does not

dictate judicial deference to agency interpretations in all

circumstances. See, e.g., Larson, 2 F.3d at 468 (under Chevron,

"courts have the last word on statutory interpretation [and] the

question is one of how much weight to be accorded to agency

views") (emphasis added). In my view, however, after charting

the course for its two-tiered Chevron inquiry, the court

-28-
28

misplaces its compass by withholding deference on impermissible

grounds.

The overarching aim of the Chevron analysis is to

determine "whether Congress has directly spoken to the precise

question at issue." Chevron, 467 U.S. at 842 (emphasis added);

see K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291-92 (1988)

("[A] reviewing court must first determine if the regulation is

consistent with the language of the statute . . . [or] [i]f the

statute is silent or ambiguous with respect to the specific issue

addressed by the regulation . . . .") (emphasis added). In the

present case, the court frames the inquiry less precisely than

Chevron requires. See supra p. 7 (the issue is "whether 'energy

assistance' under [Exclusion 11] encompasses only payments

offsetting rapidly rising energy costs"). Under the Chevron

framework, the "precise question," Chevron, 467 U.S. at 842, thus

the controlling one, is much more narrowly focused: Has Congress

expressed a "specific intention" to include or exclude HUD and

FmHA URs from the ambit of the phrase "payment[s] . . . for

energy assistance"? Cf. id. at 845 (inquiring whether Congress

evinced its "specific intention" to apply EPA's proposed "bubble

concept" to the statutory term "stationary [air pollution]

source").

Language, Structure, and Purposes of the FSA and Exclusion 11

If the undefined term "energy assistance [payment]" has

a plain and determinate meaning under the FSA, as the court

suggests, see supra p. 8 ("a[ny] public subsidy for the purchase

-29-
29

of energy"); but cf. Dion v. Commissioner of Maine Dep't of Human

Resources, 933 F.2d 13, 15-16 (1st Cir. 1991) (rejecting USDA

interpretation of "child," based on FSA's variant uses of same

term), then the initial prong under the Chevron inquiry is met,

and the USDA cannot prevail no matter how plausible its

interpretation. See Public Employees Retirement Syst. v. Betts,

492 U.S. 158, 171 (1989). However, the USDA does not disagree

that the term "energy assistance [payment]," viewed in isolation,

is susceptible to more expansive interpretation. Rather, it

contends that the statutory and historical contexts of Exclusion

11 support the narrower construction given it by the agency. See

Skidgel v. Maine Dep't of Human Servs., 994 F.2d 930, 937 (1st

Cir. 1993) ("plainness" of legislative language must be

considered in the context of the entire statute and its policy

goals); see also National R.R. Passenger Corp. v. Boston & Maine

Corp., 112 S. Ct. 1394, 1401 (1992) (same). Thus, at least three

related impediments must be overcome before the term "energy

assistance [payment]" can be considered sufficiently "plain" to

warrant withholding Chevron deference in this case.

First, at the same time it explicitly added "income"

exclusions to the FSA in 1977, Congress clearly evidenced its

intention that the statute's "broad-gauged definition of income

. . . measure income as broadly as possible to be fair to all

[FSA] recipients as well as to the tax-paying public and not

simply by reference to purchasing power available for food."

H.R. Rep. No. 464, 95th Cong., 1st Sess. 27 (1977), reprinted in

-30-
30

1977 U.S.C.C.A.N. 1978, 2004; see 7 U.S.C. 2014(d) ("Household

income for purposes of the [FSA] shall include all income from

whatever source excluding only . . . .") (emphasis added). Given

this historical context, it would seem appropriate to recognize

that the FSA's broadly gauged "income" inclusion provision

strongly suggests that exclusions from "income" under the FSA are

to be strictly limited, lending considerable rational force to

the USDA's limiting interpretation of the Exclusion 11 term

"energy assistance [payments]." Cf., e.g., Commissioner v.

Jacobson, 336 U.S. 28, 49 (1949) (Internal Revenue Code's

deliberately broad definition of taxable "income" necessitates

limiting interpretation relating to exemptions).

Second, the court concedes that the entire phrase

"energy assistance [payments]" not merely its discrete

component "energy assistance" is ambiguous in one important

and unmistakable respect; viz., viewed as a unitary federal

assistance payment, the average HUD or FmHA UR unlike, for

example, a payment made pursuant to the Low Income Home Energy

Assistance Act, see supra pp. 9-10 obviously is not purely a

"payment[] or allowance[] made for the purpose of providing

energy assistance," but often includes various nonenergy

components (e.g., water charges, trash collection charges). The

court proposes to avoid the looming interpretive dilemma in its

path by requiring the agency to segregate these nonenergy UR

-31-
31

components from the energy component. See supra pp. 10-11.7 As

the district court aptly noted, however, the entire phrase

"payments . . . made for the purpose of energy assistance"

suffers from a latent ambiguity and raises a serious question as

to whether the 96th Congress ever considered the possibility that

Exclusion 11 might be interpreted to include discrete portions of

"mixed" or multi-purpose utility payments like HUD and FmHA URs.

Finally, the conclusion that the USDA interpretation is

at odds with the legislative policy underlying the FSA does not

withstand scrutiny. Recipients of HUD and FmHA URs can lay claim

to no special burden under the food stamp scheme. Congress

itself has recognized the principle of "fairness" which underlies

7Given the FSA's complex structure, and the internal cross-
references in Exclusion 11 to other federal and state
statutes of comparable complexity, it is difficult to accept
the facile conclusion that segregation of the energy
component from the nonenergy components in URs would pose no
significant administrative burden. The USDA vigorously
insists otherwise, and the district court prudently bypassed
the entire administrative implementation issue. See Estey,

814 F. Supp. at 158 n.2. On the other hand, this court bases
its "minimal administrative burden" thesis solely on an
examination of the cold appellate record, including the FSA,
HUD, and FmHA implementing regulations, without the benefit
of a developed record relating to the types of problems which
might portend serious administrative burdens.
The USDA does not set, monitor, or control HUD or FmHA
utility allowances, nor the annual adjustments to those

allowances. Thus, even though segregation may appear a
"simple matter of arithmetic" in the abstract, it cannot
simply be assumed that segregation would not entail elaborate
inter-agency monitoring and policing for example, between
the USDA and HUD to ensure that food stamp recipients
correctly declare the appropriate components of their URs as
excludible income. Absent some contrary evidence, therefore,
the USDA's assessment of the likely burdens entailed in
implementing such an administrative regime warrants prima
facie deference.

-32-
32

the FSA's narrowly-drawn income exclusions, and the competing

interests at stake in any benefit allocation made by government.

See H.R. Rep. No. 464, supra, at 27. While acknowledging that

families with the lowest incomes often feel the financial brunt

of this congressional policy choice, the USDA assiduously acts to

further that legislative policy by treating as includible income

many other routine and need-based assistance payments which

increase a family's real purchasing power. See, e.g., 7 C.F.R.

273.9(b) (2)(i) (supplemental SSI and AFDC, and "other

assistance programs based on need" are includible in food stamp

"unearned income") (emphasis added); id. 273.9(b)(2)(ii)

(veteran's and unemployment compensation payments); id.

273.9(b)(2)(iv) (scholarships). Thus, notwithstanding the

strong humanitarian preference for affording maximum nutritional

benefits to needy families, it is precisely this type of policy

balancing, and allocation of finite governmental resources, that

Chevron normally ordains be left to politically accountable

administering agencies rather than the courts. See Chevron, 467

U.S. at 866 ("[F]ederal judges who have no constituency

have a duty to respect legitimate policy choices made by those

who do.").

In sum, the "precise question" for determination under

the Chevron analysis is whether the FSA evinces Congress's

"specific intention" to bring HUD and FmHA UR payments within

Exclusion 11. Although in my view the operative phrase "payments

. . . for energy assistance" is ambiguous, the very least these

-33-
33

three impediments to a "plain" language interpretation require is

careful attention to any relevant legislative history which might

throw light on its meaning.

-34-
34

Legislative History of FSA and Exclusion 11

The focus of the search is on any historical evidence

of a specific congressional intent to classify URs as "energy

assistance" payments or, alternatively, evidence that Congress

left this type of definitional task to agency expertise. See

Chevron, 467 U.S. at 844 ("Sometimes the legislative delegation

to an agency on a particular question is implicit rather than

explicit."). The relevant legislative history confirms that

Exclusion 11 is at least ambiguous on the matter at issue. See

Dion, 933 F.2d at 16 (looking to legislative history to confirm

nonambiguity of statutory language).

I readily agree with the court that its proposed

interpretation of the various pre-enactment committee reports is

eminently reasonable. On the other hand, the USDA points to

several references in the committee reports suggesting that

Congress, in the wake of the unprecedented OPEC oil crisis,

contemplated no exclusion from "income" for federal "energy

assistance" payments to FSA recipients, except for

"extraordinary" energy expenses not already addressed through the

"ordinary mechanisms" in the FSA for accommodating normal infla-

tionary cost-of-living increases. S. Rep. No. 394, 96th Cong.,

2d Sess. 111 (1980), reprinted in 1980 U.S.C.C.A.N. 410, 520.

The pivotal Committee Report, H.R. Rep. No. 788, 96th

Cong., 2d Sess. 122-23 (1980), reprinted in 1980 U.S.C.C.A.N.

843, 955-56 [hereinafter: "House Report No. 788"], see supra pp.

17-18, cites to particular examples of recently enacted federal

-35-
35

statutes providing "payments . . . for the purpose of energy

assistance." See, e.g., Home Energy Assistance Act, 94 Stat. 229

(1976) (formerly codified at 42 U.S.C. 8601-8612 (1976))

(repealed and reenacted as Low Income Home Energy Assistance Act,

Pub. L. No. 97-35, 2601-2610, 95 Stat. 893 (1981) (codified at

42 U.S.C. 8622-8629 (1982))) [hereinafter: LIHEAA or LIHEAP];

see also S. Rep. No. 394, supra at 111 (committee report on

LIHEAA). House Report No. 788 noted that the federal "interven-

tion" payments authorized under these "new" programs had enabled

low income households to "meet the dramatic increases in home

heating costs," "to buy the same amount of energy they would have

utilized in past years without having to diminish their already

marginal incomes," and thereby "represent[] more of a wash

transaction than any real increase in the [FSA] recipient or

benefited household's purchasing power." H.R. Rep. No. 788,

supra, at 122 (emphasis added).

Although these references may not compel the

interpretation adopted by the USDA, they surely support a

permissible inference that this was the specific type of federal

"energy assistance" payment targeted by Exclusion 11. Having

promptly adopted this statutory gloss, both in its regulatory

definition, see 7 C.F.R. 273.9(c) (5) (FSA "income" includes

all reimbursements for "normal household living expenses" which

"do not represent a gain or benefit to the household"), and in

practice, the USDA maintains that FSA income exclusions for

reimbursements of routine energy costs would go well beyond

-36-
36

merely holding FSA recipients "harmless," for the obvious reason

that the FSA, HUD, and FmHA programs already contain mechanisms

for taking into account any general inflationary energy increases

(e.g., FSA's "standard" and "excess shelter" deductions).

Similarly, House Report No. 788 demonstrates that

Congress did not hesitate to delegate significant discretion to

the USDA to determine which state-paid benefits are properly

classified "energy assistance [payments]" under Exclusion 11, see

H.R. Rep. No. 788, supra, at 123 ("provided that [the USDA] is

satisfied that the increase in [state or local] benefits . . .

is, in fact, an energy assistance-related increase and not simply

a general welfare increase") (emphasis added). Significantly,

one criterion Congress established for guiding the USDA's

classification of these benefits is that state benefit increases

could only be considered "energy assistance [payments]" "to the

extent that the increase is attributable to high heating costs

rather than general inflationary conditions." Id. (emphasis

added).

"Hold Harmless" Payments

The court offers two rejoinders to the USDA's reading

of the legislative history. With respect, I believe both are

flawed. First, moving beyond its questionable conclusion that

nothing in House Report No. 788 confirms the USDA's inter-

pretation of "energy assistance [payments]," the court states

that the USDA's policy choice is "at odds" with the legislative

history. See supra p. 19. The court's statement presumably

-37-
37

stems from two premises: (1) USDA's practice of including URs as

food stamp "income" fails to hold food stamp families "harmless"

by ensuring that "a household's expenditures for energy remain

constant as a percentage of household income, from year to year,"

and (2) hypothetical UR payments might sometimes contain

reimbursements for superinflationary energy cost increases, for

which URs would hold tenants "harmless." In order to assess the

soundness of these two premises, it is necessary first to

determine what Congress meant when it said that the "new" energy

programs were designed to hold recipient families "harmless" for

"energy assistance" payments, LIHEAP being a known type of "new"

energy assistance payment.

Congress enacted LIHEAA intending that "new" programs

of its type would supplement preexisting governmental assistance

programs which had not previously provided benefit adjustments to

low income households to account for energy cost increases which

outpaced general cost-of-living increases. See S. Rep. No. 394,

supra, at 111 (expressing concern that "the ordinary mechanisms

for adjusting income assistance programs to the rising costs of

living may be inadequate to meet the extraordinary increases

which have taken place in energy costs") (emphasis added). Thus,

when enacting LIHEAA, Congress ostensibly determined that

preexisting statutory mechanisms for making adjustments for

"substantial [energy rate] increases," like those already

incorporated in the FSA, HUD and FmHA programs, were ill-designed

to offset recent and unprecedented "spike" increases in energy

-38-
38

costs, and opted to reimburse food stamp recipients in full for

all otherwise unreimbursed expenditures for these past and future

"spike" increases. Cf. 42 U.S.C. 8624(f) (LIHEAP payments not

includible as "income" in calculating food stamp entitlements).

Thus, in two senses, food stamp recipients realized no real

"gain" from LIHEAA: (1) LIHEAP payments merely offset super-

inflationary energy cost increases, and food stamp recipients

were simply restored to their pre-OPEC financial position, so as

to afford them the same amount of energy as before the oil

crisis, without loss of real spending power, and (2) since these

superinflationary energy cost increases were not being offset by

any other statutory cost-of-living assistance provision, LIHEAP

payments would effect no double compensation, or "gain," to food

stamp families. In these respects, therefore, LIHEAA worked a

complete "wash."

On the other hand, consider the following hypothetical

calculations of representative housing assistance payments and

URs:
1990 1991

approved rent $300 $300
+ utility allowance $ 60 $ 72

= approved shelter cost $360 $372
- 30% family income $ 45 $ 45
of $150

housing assistance $315 $327
payment
- approved rent $300 $300

utility reimbursement $ 15 $ 27

-39-
39

The utility allowance, which may or may not reflect actual

utility costs, is an average figure calculated by the "landlord"

for all units in a covered facility, and is designed to afford

tenants an "adequate" allowance for household utilities, while

deterring inefficient energy usage. As the court points out,

"substantial" annual increases in energy rates (e.g., more than

10%) might require the "landlord" to make corresponding increases

in the pre-set utility allowance. See 7 C.F.R. pt. 1930, subpt.

C, exh. E.IX.C; 24 C.F.R. 882.214, 965.478. So, in our hypo-

theticals, if utility rates increased to $72 over one year, a 20%

increase, the tenant's UR would increase from $15 to $27. If the

general or across-the-board inflation rate for the same year were

only 15%, then one-quarter of the $12 increase in the UR paid to

the tenant, or $3, could be considered an additional reimburse-

ment for utility cost increases beyond the general inflationary

rate, and some lesser portion of that segregable payment of $3

would be for superinflationary energy (as opposed to nonenergy

utility) price increases. Accordingly, our hypothetical $27 UR

would include three components: basic energy cost ($15), general

inflationary increase ($9), and superinflationary increase ($3).

When the identical "hold harmless" analysis just

applied to LIHEAP is applied to the housing URs Congress

established prior to its enactment of LIHEAA, the flaw in the

thesis advanced by the court becomes clear.8 Unlike LIHEAP

8The court concludes that "USDA's practice of counting the
energy component of [URs] as income does not hold tenants
'harmless' for the assistance they receive." See supra pp.

-40-
40

payments, URs simply are not payments made pursuant to a "new

program" as specifically referred to in House Report No. 788.

[See supra p. 9.] For example, HUD's section 8 housing

legislation was enacted in 1974, see P.L. No. 93-383, 201(a),

88 Stat. 653 (1974) (codified at 42 U.S.C. 1437), well before

Congress can reasonably be thought to have foreseen the

superinflationary energy price increases experienced in the late

1970s. When URs were first established, therefore, Congress

could not have contemplated, let alone intended, that the UR's

"basic cost" component ($15) or its "general inflation" component

($9) would hold recipient families "harmless" in the two special

senses in which LIHEAA later benefited its recipients. Prior to

their initial entitlement to URs, low income families presumably

paid the full $60 utility cost from income; whereas immediately

after the establishment of URs, it cost the same family only $45

to purchase the same amount of energy it had purchased for $60

the previous year. Congress established the "basic cost"

component in utility allowances and URs to reduce the percentage

of household income that must be expended for energy regardless

of past inflationary trends. Thus coupled with an adequate

internal mechanism for making future adjustments for general

inflationary increases, the UR worked a real $15 increase in

overall purchasing power, not merely a "wash."

20-21. Regardless whether this is the right answer, however,
the court has not posed the right question. The appropriate
inquiry is whether these HUD and FmHA housing programs were

intended to hold families harmless in the same way LIHEAA was
meant to do.

-41-
41

At most, therefore, the court has demonstrated in

theory that the USDA might be required at some time in the future

to exclude a relatively small portion of some URs from food stamp

"income"; viz., the $3 (or less) of the hypothetical $27 UR

attributable to any "superinflationary component." But this

theory inevitablyimports seriousconceptual impediments ofits own.

First, in defense of this theory the court disregards

the unitary nature of UR payments, opining that the USDA can

easily segregate URs into their energy and nonenergy components,

thereby smoothing the path for its conclusion that the UR's

energy component alone qualifies for "exclusion" from FSA

"income." See supra pp. 10-11; but cf. supra pp. 31-32. Having

thus disregarded the unitary nature of UR payments, the court

cannot then credibly suggest that the USDA would be acting

arbitrarily by segregating and excluding from FSA income a UR's

hypothetical superinflationary component ($3) while at the same

time including the UR's "basic cost" ($15) and "general

inflation" ($9) components in FSA income. Second, and more

importantly, no part of any UR will include such a super-

inflationary component during periods of subinflationary, stable,

or declining energy prices. Indeed, the USDA concedes that it

may be appropriate to exclude from FSA income a UR which actually

represents a reimbursement for superinflationary energy

increases. Given general economic trends in the late 1980s and

early 1990s, however, appellants advisedly have not argued that

their own URs covered any superinflationary energy price

-42-
42

increases, nor do they suggest that USDA has attempted to include

any such superinflationary component in any other food stamp

recipient's "income." Rather, the USDA continues to include HUD

and FmHA URs in food stamp "income" on the theory that unless

proven to contain some superinflationary component, current HUD

and FmHA URs presumably reimburse only "routine" energy costs and

subinflationary increases in energy costs. The current USDA

regulations flexibly track this presumption by reference to the

includibility of all reimbursements for "normal household living

expenses." As a consequence, I find no support for the thesis

that the USDA's policy choice is "at odds" with the legislative

history.

State "Energy Assistance" Payments

As its second rejoinder, the court takes the position

that the language quoted from House Report No. 788, see supra at

pp. 17-18, considered in context, can lead to one reasonable

conclusion only that Congress was particularly concerned that

"state and local governments might pass off increases in

existing, nonenergy-related welfare program payments as 'energy

assistance'" so as to shift local welfare burdens to federally-

funded programs (e.g., the FSA program). Once again, however,

this thesis does not withstand close scrutiny, let alone begin to

dispel the plausibility of the alternative view advanced by the

USDA.

If this sort of burden shifting had indeed been a

matter of significant legislative concern, it would have been a

-43-
43

simple matter for Congress to authorize a FSA income exclusion

for all bona fide energy cost assistance paid to food stamp

recipients by the States. All Congress need have done is to

require States to satisfy the Secretary that any increases in

state-paid benefits were for food stamp recipients' energy cost

increases, rather than their nonenergy cost increases. In

addition to its threshold requirement that energy cost increases

be the "but-for cause" of any increase in a state's

reimbursements, however, Congress imposed a second, subsidiary

condition: even a state's bona fide energy-related

reimbursements should be exempt under Exclusion 11 "only to the

extent that the [benefit] increase is attributable to high

heating costs rather than general inflationary conditions." The

court has not explained how Congress could have meant to thwart

improper diversions of State welfare program costs by prohibiting

FSA income exclusions for bona fide subinflationary energy cost

reimbursements by a State, if federal payments for the same

purposes were readily excludible from food stamp income. In

sharp contrast, the reading given House Report No. 788 by the

USDA dovetails neatly with the stated goals of "new" federal

programs, such as LIHEAA, which Congress referred to as

prototypes of federal "intervention" payments for "energy

assistance."

In conclusion, the USDA's interpretation is

corroborated both by a reasonable reading of Exclusion 11's

ambiguous language and its legislative history. There is no

-44-
44

statutory or historical evidence whatever that Congress has

evinced a "specific intention" to include HUD and FmHA URs within

the Exclusion 11 language: "payment[s] . . . for energy assist-

ance." Congress has never once alluded to HUD and FmHA URs as

"energy assistance [payments]," even though URs preceded the

enactment of Exclusion 11 by some six years. See, e.g., P.L. No.

93-383, 201(a), 88 Stat. 653 (1974). Chevron deference is not

dependent on a determination "that the agency construction was

the only [permissible] one . . . , or even the reading the court

would have reached if the question initially had arisen in a

judicial setting." Chevron, 467 U.S. at 843 n.11.

Notwithstanding its able effort to dispel the permeant

ambiguity in the relevant legislative history, and interpret

Exclusion 11 apart from its unique historical context, the court

has disclosed no suggestion that Congress ever intimated its

disapproval of the USDA's longstanding policy against treating

routine utility reimbursements as "energy assistance [payments]."

Although I recognize that "[c]ongressional inaction frequently

betokens unawareness, preoccupation, or paralysis," Zuber, 396

U.S. at 185-86 n.21, Congress has amended Exclusion 11 not once

but twice since the USDA adopted its present policy on URs. See,

e.g., Lorillard v. Pons, 434 U.S. 575, 580 (1978) (noting:

"Congress is presumed to be aware of an administrative . . .

interpretation of a statute and to adopt that interpretation when

it re-enacts a statute without change") (emphasis added).

Nevertheless, implicit in the approach adopted by the court is

-45-
45

the impermissible presumption that on both occasions when

Exclusion 11 was amended, Congress was unfamiliar with the

administering agency's policy position on the very provision upon

which the agency's policy depends. See Pub. L. No. 100-435,

343, 102 Stat. 1647, 1663-64 (1988); S. Rep. No. 397, 100th

Cong., 2d Sess. 28-29 (1988), reprinted in 1988 U.S.C.C.A.N.

2239, 2266-67 (designating FSA amendment as a "technical correc-

tion" which "is not intended to change current policy") (emphasis

added). Not only is there no statutory or historical basis for

this presumption but it undermines Chevron itself, which would

otherwise require deference to the reasoned interpretation of

Exclusion 11 adopted by the USDA as the FSA's administering

agency.

For the foregoing reasons, I respectfully dissent.

-46-
46