SIERRA CLUB, et al., Plaintiffs,
Appellants,

v.

Thomas D. LARSON, et al.,
Defendants, Appellees.

SIERRA CLUB, et al., Plaintiffs,
Appellants,

v.

Thomas D. LARSON, et al.,
Defendants, Appellees.

SIERRA CLUB, et al., Petitioners,

v.

Julie BELAGA, etc., Respondent.

Nos. 92–2227, 92–2323 and 92–2282.

United States Court of Appeals,
First Circuit.

Heard March 3, 1993.

Decided Aug. 6, 1993.

Thomas B. Bracken with whom Bracken & Baram, Boston, MA, was on brief for plaintiffs, appellants.

George B. Henderson, II, Asst. U.S. Atty., Boston, MA, with whom Myles E. Flint, Acting Asst. Atty. Gen., Washington, DC, A. John Pappalardo, U.S. Atty., Boston, MA, Robert L. Klarquist, Atty., Dept. of Justice, Michael Kenyon, Atty., U.S. E.P.A., Judith Tracy, Atty., U.S. E.P.A., Washington, DC, and Irwin Schroeder, Atty., Federal Highway Admin., Albany, NY, were on joint brief of appellees and respondent, for federal appellees.

William L. Pardee, Asst. Atty. Gen., Com. of Mass., with whom Scott Harshbarger, Atty. Gen., Com. of Mass., Boston, MA, was on joint brief of appellees and respondent, for state appellees.

Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.

BOUDIN, Circuit Judge.

In this case, the Sierra Club appeals from the judgment of the district court declining to enjoin construction of the central artery/third harbor tunnel project in Boston. It also petitions to review the action of the Environmental Protection Agency in approving an amendment to Massachusetts state regulations that bears upon the project. We affirm the district court and deny the petition for review.

## I. THE FACTS AND PRIOR PROCEEDINGS

Massachusetts, through its Department of Public Works, has begun construction of a mammoth project that includes rebuilding a major segment of Interstate Route 93 that now runs on a viaduct through downtown Boston and is known as "the central artery." When the central artery/tunnel project is completed some years from now, the highway segment in question will be widened, sunk below ground level, and mostly covered. It

will connect at the north with a new bridge across the Charles River and at the south with a newly built third harbor tunnel running from South Boston to Logan Airport in East Boston.

The depressed and covered portion of the new highway and the tunnel will be ventilated by ducts and fans in six buildings located on the highway route and near the tunnel portals. Vast amounts of air will be drawn into the covered highway and tunnel, and the mixture of air and motor vehicle emissions will be pumped up through the six buildings and exhausted through stacks ranging from 90 to 225 feet high. Studies indicate that the project will reduce traffic congestion, increase average speeds, and reduce area-wide carbon monoxide and hydrocarbon emissions.

The Sierra Club, a non-profit environmental group, believes that whatever the area-wide effects of the project, it will create new "hot spots" of pollution in certain of the neighborhoods near to the six ventilation buildings. In its view, pollution control equipment, in the nature of after-burners, should be installed in the ventilation buildings. The federal and state governments, which have filed a joint brief in this case, deny that any dangerous hot spots will be created, pointing to studies conducted as part of the project's environmental review. They also assert that after-burner technology is not feasible because of the low concentration of pollutants in the vented air.

In March 1991, the Sierra Club and certain of its members who live in the vicinity of the central artery brought suit in district court against a collection of state and federal officials associated with the project. The gravamen of the suit was the Sierra Club's claim that the ventilation buildings planned for the project comprised a "major stationary source" of air pollution as that term is used in the Clean Air Act, 42 U.S.C. § 7401, *et seq.*, and counterpart Massachusetts regulations, 310 C.M.R. § 7.00 *et seq.* It is common ground that, if the ventilation buildings

were so classified, then the project would require a permit or permits from Massachusetts that have not been secured. To frame this issue entails a brief description of the statute.

■ The Clean Air Act enacted a complex statutory regime, several times amended, to control and mitigate air pollution in the United States. Broadly speaking, Title I of the statute regulates stationary sources of pollution and Title II regulates mobile sources, most importantly motor vehicles. For specified pollutants, national air quality standards are promulgated by the EPA. 42 U.S.C. § 7409. Whether new construction of polluting facilities is permitted in an area, and what kind of controls are required, depends on whether the area is below or above the standard for each pollutant. Part C, 42 U.S.C. §§ 7470–7492, governs permits where the standard has been attained; Part D applies to so-called nonattainment areas. *Id.* §§ 7501–7515.

■ In either event, the construction of a "major" new stationary source—normally, one emitting 100 or more tons of pollutant each year, *see* 42 U.S.C. § 7602(j)—generally requires a permit. 42 U.S.C. §§ 7475(a), 7502(c)(5).[1] In the case of Boston, some of the pollutants that will flow through the proposed ventilation buildings currently exceed national standards so that new major sources are subject to the more stringent class of limitations; other pollutants are below the standards and less stringent limitations apply. By way of example, the Boston area exceeds the national standard for carbon monoxide, and to secure a permit the highway proponents would have to show that a major stationary source can achieve the "lowest achievable emission rate" for that pollutant. 42 U.S.C. § 7503(a)(2).

■ The Clean Air Act allocates different responsibilities to the EPA on the one hand and to the states on the other. Each state is

1. The definition of "major stationary source" in section 7602(j) directly governs permits under part D where the same phrase is used in section 7502(c)(5)'s permit requirement. Part C requires permits for specified "major emitting facilities," in areas already in compliance with pollution standards, 42 U.S.C. §§ 7475, 7479, but—with qualifications not here relevant—the statute instructs that the terms "major stationary source" and "major emitting facility" be used interchangeably. 42 U.S.C. § 7602(j).

directed to adopt and submit to the EPA for approval a state implementation plan to achieve and maintain the national standards established by the EPA. 42 U.S.C. § 7410(a). *See also id.* §§ 7471, 7502. If the state fails to adopt an approvable plan, the EPA must adopt federal regulations for the area. 42 U.S.C. § 7410(c). Massachusetts has an approved state implementation plan. Under the Clean Air Act, "citizen" suits may be brought to enjoin a project that requires a permit under Parts C or D but has not obtained one. 42 U.S.C. § 7604(a)(3).

In this case, in April 1991 the Sierra Club and certain of its members sought a preliminary injunction against construction of the central artery and tunnel project. The request was denied on July 30, 1991. After transfer of the case to another judge, the district court received further briefing and argument. On September 16, 1992, the court granted summary judgment in favor of the government defendants, state and federal, holding that the ventilation buildings did not comprise stationary sources subject to pre-construction permit requirements. The Sierra Club and its named members appealed.

Shortly before the lawsuit, the Massachusetts Department of Environmental Protection submitted to the EPA on January 30, 1991, a new regulation—regulation 7.38, codified as 310 C.M.R. § 7.38—as a proposed amendment to the Massachusetts state implementation plan. This regulation seeks to classify tunnel ventilation systems as "indirect sources" under the Clean Air Act. In the early 1970s, the EPA had begun to require that state implementation plans regulate such facilities as parking lots, highways and garages that do not emit pollutants themselves but attract numbers of polluting vehicles. Congress responded in 1977 by barring the EPA from regulation of what were called "indirect sources." 42 U.S.C. § 7410(a)(5)(B).[2] However, Congress at the same time gave the states permission, if they so chose, to regulate such indirect sources themselves as part of their state implementation plans. *Id.* § 7410(a)(5)(A), (C).

Massachusetts, exercising this option through regulation 7.38, proposed to regulate roadway/tunnel ventilation systems as indirect sources. The regime involves certification by the builder that specified pollution standards will be met, and the Department of Environmental Protection may accept, conditionally approve, or reject the certification after notice and hearing. Monitoring after construction and periodical renewal of the certificate are required. The new regulation also states that the systems are not subject to the preconstruction permitting required for various stationary sources under regulation 7.02, 310 C.M.R. § 7.02.

The Sierra Club opposed the approval of regulation 7.38 when Massachusetts submitted it to the EPA as an amendment to the state implementation plan. The Sierra Club argued that the effect would be indirectly to relieve the project at issue in this case of the more stringent pre-construction approval required of major stationary sources under the Clean Air Act and the Massachusetts regulations that apply to stationary sources. After notice and receipt of public comments, the EPA on October 8, 1992, published notice of its approval, 57 Fed.Reg. 46310 (1992). The Sierra Club then petitioned for review of the EPA's action in this court pursuant to 42 U.S.C. § 7607(b)(1).

Because of the overlapping issues and common subject, this court consolidated the two appeals taken from the district court judgment with the proceeding for direct review of the EPA action. In this opinion, we address first a jurisdictional objection raised by the federal defendants, then statutory issues posed by the appeals from the district court, and finally the additional issues posed by the Massachusetts regulations and by the petition to review the EPA's action approving regulation 7.38.

## II.  JURISDICTION

■ The federal defendants renew in this court their argument, not passed upon below,

---

**2.** To the extent that a highway or other major indirect source is federally assisted, the EPA retains some direct regulatory authority, *see* 42 U.S.C. § 7410(a)(5)(B); but no claim has been

made that the project in this case is in violation of any requirements laid down by the EPA under this reservation.

that the district court "lacked jurisdiction" over the complaint against the federal defendants. The "citizen suits" provision of the Clean Air Act permits private suits in three defined classes of cases. As already noted, it explicitly permits a private suit against anyone who "proposes to construct" any major stationary source without a permit required by parts C or D. 42 U.S.C. § 7604(a)(3). The federal defendants deny that they are proposing to construct the project or any part of it; in other words, they argue that if anyone is subject to suit under subsection (a)(3), it is only Massachusetts officials.

The statute also permits such citizen suits where emission standards or limitations are exceeded, or where the EPA Administrator has failed to perform an act or duty under the Clean Air Act "which is not discretionary ...." 42 U.S.C. §§ 7604(a)(1), (2). As to these categories, the federal defendants argue that any violations of emission standards or limitations would be those of the state, and that the EPA Administrator cannot be sued for violating a non-discretionary duty since enforcement by the Administrator is inherently a discretionary matter.

The Sierra Club, responds, unpersuasively, that any jurisdictional objection has been waived by the failure of the federal defendants to cross appeal.[3] More usefully, the Sierra Club urges that the Administrator did violate a non-discretionary duty by failing to take action to enjoin the project, and that in any event the Federal Highway Administration is so closely involved in the funding and planning of this project as to be effectively a party to its construction. However, like the government brief, the Sierra Club's brief is silent as to what practical implications these questions have in this case where no one has disputed that Massachusetts defendants can be enjoined from construction if a permit is required.

Absent some showing that the jurisdictional issue has practical importance in this case, we decline to address it. Since the Massachusetts officials are subject to suit for constructing the project without a permit, the

merits must be reached in any event. And since we resolve the merits in their favor, the jurisdictional issue as to the federal defendants is pretty close to moot, affecting only the form of the dismissal as to them. There is ample precedent for by-passing jurisdictional objections when the court can more easily dismiss on the merits. *E.g., Norton v. Mathews,* 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672 (1976).

## III. THE STATUTORY ISSUES

█ The merits of the appeals from the district court judgment turn principally on a narrow point of statutory construction, namely, whether the ventilation buildings that will vent the underground highway and harbor tunnel comprise a "stationary source or sources" within the meaning the Clean Air Act. If so labeled, a permit is required; apparently the amount of pollutant needed to qualify as a "major" source is not at issue. Easily stated, the issue is less easily resolved: there is little by way of statutory definition, no useful judicial precedent or legislative history offered to us, and a reasonable possibility that Congress never gave any thought to the idiosyncracy posed by these ventilation buildings.

Starting as one normally does with language, parts C and D, which contain the pre-construction permit requirements for major stationary sources, originally contained no definition of stationary source. Instead part D defines a "major stationary source" as "any stationary facility or source" emitting the specified quantity of pollutant. Part C, by cross-reference (see note 1, above), adopts the same language. Part A, concerned with so-called performance standards, other than air quality standards, did use the term "stationary source" in 42 U.S.C. § 7411, defining it as "any building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. § 7411(a)(3). That

---

**3.** The jurisdictional objection could be viewed as an alternative ground for sustaining the denial of an injunction, dispensing with any need for a

cross appeal. In any event, courts are expected to "notice" jurisdictional objections even if no one has raised them.

definition, however, was adopted "for purposes of this section," *i.e.,* section 7411.[4]

Thus far the breadth of the language appears helpful to the Sierra Club position, since linguistically a ventilation system with a stack could be called a "facility," a "source" or even a "building." The table tilted back the other way in 1977 when Congress amended the Clean Air Act to exclude "indirect sources" from mandatory coverage in state implementation plans. 42 U.S.C. § 7410(a)(5)(A). An indirect source is defined in the statute as

> a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply....

42 U.S.C. § 7410(a)(5)(C). Asserting that auto makers should bear the brunt of reducing tailpipe emissions, Congress imposed the limitations already described on the EPA efforts to regulate the magnets for vehicles rather than the vehicles themselves. *See* H.R.Rep. No. 294, 95th Cong., 1st Sess. 219–227 (1977), U.S.Code Cong. & Admin.News 1977, 1077, 1298–1306.

■ Although indirect sources are not in terms excluded from the definition of stationary sources—the former provision is cast instead as a limitation on EPA authority—the effect of the amendment is to treat indirect sources as a separate category of sources subject to a different legal regime. The states may still "choose[ ]" to regulate them in state implementation plans, 42 U.S.C. § 7410(a)(5)(A)(i), but the decision whether and how to regulate is left largely to the states. Our best reading of the statute is that, at least after 1977, an indirect source is not to be treated as a stationary source under Parts C and D. *Cf. South Terminal Corp. v. EPA,* 504 F.2d 646, 669 (1st Cir. 1974) ("parking structures, which themselves emit no pollutants but instead only attract vehicles which emit pollution, are not stationary sources").

Assuming that a stationary source and an indirect source are exclusive categories, the difficult question remains whether ventilation buildings should be assimilated to the former or to the latter. It is a question that dictionaries cannot answer. The terms are technical rather than common ones, and they were developed against the background of a complex statute with interlocking provisions and specific goals. Nor does legislative history furnish any clue as to Congress' intent for ventilation buildings. Perhaps this small corner among possible applications of the statute was simply overlooked.

Similarly, it is difficult to derive any clear cut answer from analogy or policy.[5] A covered highway or tunnel with a ventilation system is akin to an uncovered highway or open sided garage—clearly, indirect sources—in multiple senses: in each instance the facility or space attracts more cars, pollution in the vicinity may be greatly increased, and the initial source of the pollution is the cars themselves. On the other hand, the possibility exists (no information has been provided to us on the point) that the large scale ventilation systems may be more potent than a highway or garage in concentrating and expelling pollutants in a specific area; and on this ground, if no other, one might distinguish between them and a facility that is ordinarily ventilated without mechanical

4. The obscurity of the relationship between the part A definition just quoted and the "major stationary source" in parts C and D was the subject of comment by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 859–860, 104 S.Ct. 2778, 2790, 81 L.Ed.2d 694 (1984). Yet another definition of stationary source appears in, and is apparently limited to, a provision of part A concerned with accidental release of hazardous substances. *See* 42 U.S.C. § 7412(r)(2)(C).

5. The Sierra Club urges that the definition of stationary source is analogous to the definition of

"point source", 33 U.S.C. § 1362(14), in the Clean Water Act and that we should regard the related caselaw as precedent. *See National Wildlife v. Gorsuch,* 693 F.2d 156, 173–174 (D.C.Cir. 1982). We find little help from a different term used in a different statutory scheme. Nor do we think that it matters whether, as the Sierra Club asserts, pollution tests or projections done by engineers for the ventilation systems are akin to those done for stationary sources; presumably, they would also be similar if the system vented a large garage, which is unquestionably an indirect source.

aid. Thus the analogy hardly dispels all doubt.

Two other arguments pressed by the parties seem to us inconclusive. The Sierra Club points us to a new provision, added to Title I in 1990 without limitation as to its application, which for the first time defines stationary source as meaning "generally any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle as defined in section 7550...." 42 U.S.C. § 7602(z). The Sierra Club stresses the word "directly," arguing that the emissions from the ventilation shaft do not fit the "except" clause because the auto emissions are emitted first ("directly," in the Sierra Club's view) into the air of the covered highway or tunnel and only then gathered by fans and spewed out through the ventilators.

The government brief offers its own parsing of this new language, but both sides' arguments about what is "direct" and what is an "indirect" emission have the flavor of a Medieval dispute in theology. The reality is that Congress framed this new subsection (z) to deal with an entirely different problem, namely, to include within the stationary source definition mobile sources of pollution, like ships in port and portable asphalt concrete plants, so far as they emit pollutants as part of their stationary activities, *e.g.*, by leaking fuel at dockside (in contrast to engine emissions that occur when the ship or plant travels to a new destination). S.Rep. No. 228, 101st Cong., 1st Sess. 376 (1990). In other words, Congress was not addressing tunnel ventilation when it drew up this new provision.

Conversely, we are doubtful about the government's argument based upon the structure of the statute. Admittedly, Congress did establish two different regimes: that in Title I, with which we are concerned, governed stationary sources; that in Title II created a quite different regime, part of

which is familiar to anyone who has a car inspected, to regulate vehicle emissions directly. This symmetry could suggest that tailpipe pollution—the source of the pollutants at issue here—was not meant to fall within Title I at all. The difficulty is that Congress might not have minded two layers of control, and contrivances like the "indirect source" provision in Title I blur the notion that auto pollution is exclusively a Title II problem.

In the end, we think the balance is tipped here by the explicit administrative interpretation of the Clean Air Act adopted by the EPA. In approving the addition of regulation 7.38 to Massachusetts' state implementation plan, the EPA stated:

> Tunnel ventilation systems, which do not generate their own emissions but rather simply funnel emissions from mobile sources, are not stationary sources within the meaning of the Clean Air Act.

57 Fed.Reg. 46310, 46311 (1992). The Supreme Court has told us that in construing a statute the courts should ordinarily show a measure of deference to the agency charged with administering the statute.[6] The case most often cited for that precept is *Chevron,* which involved a different application of the very same "stationary source" provision that is now before us.

The *Chevron* doctrine has been the subject of much debate and, in subsequent decisions, the Supreme Court may have softened its impact somewhat and in some situations. *See, e.g., INS v. Cardoza–Fonseca,* 480 U.S. 421, 448, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987). To be sure, the courts have the last word on statutory interpretation—the question is one of the *weight* to be accorded to agency views—and often the statute's language or history leaves no latitude for the agency. In other cases the issue of interpretation may be so central to the operation of the statute that, whether or not Congress' meaning is clear, it is improbable that Con-

---

**6.** See *Environmental Protection Agency v. National Crushed Stone Ass'n,* 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *United States v. City of Fulton,* 475

U.S. 657, 666, 106 S.Ct. 1422, 1427, 89 L.Ed.2d 661 (1986); *National Labor Relations Board v. Food and Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 416, 98 L.Ed.2d 429 (1987).

gress meant for the courts to defer to the agency. We do not think these or other qualifications on *Chevron* deflect its impact here.

On the contrary, this statute *is* ambiguous on the issue before us, at least when the words "stationary source" are read together with the "indirect source" proviso and the structural juxtaposition of Titles I and II. The application of the stationary and indirect source language to tunnel ventilation is not the heart of the statute but a fringe issue on which Congress did not clearly express its intent. The Clean Air Act is an immensely complex and technical statute more familiar to the EPA than to anyone else, and the task of making its parts function together harmoniously is entrusted to many actors but above all to the EPA.

In sum this is a case in which *Chevron* and deference to the agency are not makeweights or subsidiary arguments. Rather, in this fairly debatable case, where statutory language is ambiguous, legislative history is silent and policies and analogies can be and have been mustered on both sides, we think that the EPA's unqualified and precise reading is decisive. It is unnecessary to calibrate perfectly the weight to be accorded to the agency view in a case of this species: once "considerable" weight is accorded to EPA's reading of the statute, *see Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782, it is enough to tip a set of scales otherwise so closely balanced.

## IV. THE MASSACHUSETTS REGULATIONS AND EPA APPROVAL

■ Our concern with the district court case is not quite over. Even if Congress did not designate the ventilation facilities in this case as stationary sources, the possibility remains that Massachusetts has adopted in its state implementation plan—and then sought to ignore for its own construction project—pertinent legal restrictions that can be implemented through a suit under the

Clean Air Act. Of course, not every state-law restriction on a project is a matter of federal concern, but a state restriction that is part of a federally approved state implementation plan under the Clean Air Act may at least in some circumstances be within the purview of a citizens suit under 42 U.S.C. § 7604.

■ At one point in its brief, the Sierra Club seems to argue that whatever Congress may have meant by stationary source, Massachusetts in its general permit requirement regulation 7.02, 310 C.M.R. § 7.02, has required pre-construction approval of a class of facilities that includes the ventilation buildings in this case. One version of regulation 7.02 has been approved by the EPA as part of Massachusetts' state implementation plan. Although Massachusetts has adopted a later version *not* yet approved, we will assume *arguendo* that the original, approved version of the regulation still exists as a matter of federal law and that a violation of this version might well be remedied by a citizen suit under the federal statute.[7]

The difficulty with the Sierra Club's argument, as the government brief points out, is that this regulation on its face applies to a short list of specific facilities (*e.g.*, chemical products manufacturing plants) that do not include highways, tunnels or associated ventilation systems. The regulation also applies to "such other facilities as the [state] Department [of Environmental Protection] may require," but that state agency has not required pre-construction review of the ventilation buildings under this version of the regulation. The most that the Sierra Club can extract from the affidavit submitted by the head of the agency is that his agency wobbled over the issue of how to regulate the ventilators at issue in this case, and finally decided to propose the "indirect source" regime now embodied in regulation 7.38.

Regulation 7.38 which now governs tunnel ventilation systems says that they are not subject to regulation 7.02. We think that

---

**7.** The Sierra Club also argues that the more recent version of regulation 7.02 applies to the project (or would, if not invalidly qualified by regulation 7.38); but we need not decide whether the more general language of the new version

could embrace highway and tunnel ventilation systems. The new version does not reflect a federally approved requirement, nor do we think that it casts any light upon, or represents an exercise of authority under, the older version.

this exclusion seeks to remove ambiguity and is very weak evidence that the new version of regulation 7.02 would otherwise cover such systems, and no evidence at all of the meaning of the old version. Nor do we agree with the Sierra Club that its reading of old regulation 7.02 is borne out by *Town of Brookline v. Commissioner of Department of Environmental Quality Engineering*, 387 Mass. 372, 439 N.E.2d 372 (1982). That case involved the application of regulation 7.02 to a diesel fuel-powered facility (in fact, an electrical generating station), which is listed as a facility automatically covered by old regulation 7.02.

To construe the old version of regulation 7.02 definitively is a daunting task, for it was complex, ill-structured, and apparently confusing even to the state agency that administered it. But the Sierra Club's argument depends upon a showing by it that the old regulation 7.02 did govern highway and tunnel ventilation systems. Such systems do not fall within the list of specifically named facilities in the regulation. Similarly, the Sierra Club has not shown that the state agency ever extended that version of the regulation to such systems under the "may require" clause.

■ This brings us to the attack on regulation 7.38 that is the subject of the Sierra Club's direct review petition. One might at first wonder why the Sierra Club is interested in overthrowing a regulation which, if less stringent than the pre-construction permit requirement for major stationary sources, is at least a sizable step in the direction of regulating ventilation systems, a step that the state need not take at all if—as the EPA has ruled—such systems are not stationary sources but merely adjuncts to indirect sources. Indeed, the EPA's notice approving the new regulation notes that the Conservation Law Foundation endorsed it. 57 Fed. Reg. 46310, 46311 (1992).

The answer is that the Sierra Club, with considerable imagination, has constructed the following argument: the 1990 amendments to the Clean Air Act contained a savings clause that sought to forbid states from softening pre-amendment "control requirement[s]" in areas that had not attained the national air quality standard for a pollutant, 42 U.S.C. § 7515; the Boston area has admittedly not met these standards for certain pollutants; and therefore (says the Sierra Club) regulation 7.38 is in violation of the savings clause because it substitutes as to tunnel ventilation systems the softer regime of the new regulation 7.38 for the more stringent, previously applicable regime of regulation 7.02.

We will assume without deciding that the savings clause would prevent the weakening of a state implementation plan. But even so we do not read the savings clause to refer to anything other than an effective, federally approved state implementation plan.[8] It is the older version of regulation 7.02 which alone was federally approved at the time of the 1990 Clean Air Act Amendments. And, as already explained, the Sierra Club has failed to establish that the pertinent older version of regulation 7.02 did apply to covered highway or tunnel ventilation systems. Accordingly, regulation 7.38 does not weaken a federally approved state implementation plan but rather strengthens it by extending a new regime to such ventilation systems where previously no federally approved regime applied at all.

■ We are left with two further arguments in relation to regulation 7.38. First, it is claimed that regulation 7.38 is invalid because, according to the Sierra Club, the state was required by M.G.L. ch. 111, § 142A, to obtain the approval of the Governor of Massachusetts and the Executive Council but did not do so. This argument was made, it appears, on the premise that regulation 7.38 was needed by the government defendants in order to remove a bar otherwise presented by regulation 7.02. As we have seen, the

8. As Senator Chafee explained in the floor debate on this provision:

"The savings provision was intended to ensure that there is no backsliding on the implementation of adopted and currently feasible measures that EPA has approved as part of a State implementation plan in the past, or that EPA has added to State plans on its own initiative or pursuant to a court order or settlement." 136 Cong.Rec. S17,237 (daily ed., October 26, 1990).

premise is mistaken, and invalidating regulation 7.38 would probably free the ventilation systems from any federally enforceable regulation.

Nevertheless, the issue of governor-and-council approval, although irrelevant to the injunction action, is raised by the Sierra Club's petition to review the EPA's approval of the new regulation. Since the direct review statute has a time limit on petitions, 42 U.S.C. § 7607(b)(1), we cannot properly defer decision on the validity of regulation 7.38 to some future point. Indeed, the EPA in approving the regulation, noted that Massachusetts' Secretary of State had attested that the regulation was properly adopted, and the EPA itself ruled that the Massachusetts Department of Environmental Protection had authority "to adopt such regulations without approval by the Governor and Council." 57 Fed.Reg. at 46312.

It is difficult for anyone but a Massachusetts court to pronounce with certainty on this issue. But when the regulation is attested by the state secretary as validly adopted and its procedural validity is supported in a brief signed by the state's attorney general, it would take a rather strong showing to persuade us to hold that the regulation is invalid on procedural grounds. Assuming (as seems likely) that its procedural validity is open to review in this court and that the state secretary's attestation is necessary but not conclusive,[9] we think that the EPA correctly concluded that the regulation was properly adopted without the approval of governor and council.

The state in submitting regulation 7.38 to the EPA said that it was adopted pursuant to M.G.L. ch. 111, §§ 142B and 142D, not section 142A. Section 142B establishes a Boston area pollution control district and gives the Department of Environmental Protection authority to issue rules and regulations to prevent pollution in the district. Regulation 7.38, which is directed exclusively to the Boston district, appears to fit comfortably within the ambit of section 142B. The rulemaking provision of section 142B, unlike section 142A, contains no requirement for approval of rules by the state's governor or council.

The Sierra Club's contrary argument is based on confusing language in M.G.L. ch. 111, § 142A, a broader provision governing air pollution in general. In its opening sentence, this section says that the Department of Environmental Protection, "in this section and in sections one hundred and forty-two B to one hundred and forty-two E, inclusive, hereinafter called the department" may subject to the approval of the governor and council adopt regulations to control pollution. *Id.* The Sierra Club apparently reads this sentence as extending the governor-and-council approval requirement of section 142A to rules made under section 142B.

We think the more natural reading of the quoted language in section 142A is to specify that the term "department," when used without further explanation in the cited later sections, means the Department of Environmental Protection. Section 142B, for example, does refer only to "the department." Nor is there anything remarkable about requiring governor-and-council approval for general regulations while not doing so for those directed to a single district; indeed, the Sierra Club reading would make the grant of rulemaking power in section 142B redundant. Accordingly, we reject this challenge to the EPA's approval and dismiss the petition to review.

The government brief construes the Sierra Club's argument to embrace, in addition to the claim just rejected, a further claim that regulation 7.38 cannot be applied "retroactively" to the central artery and tunnel at issue in this case. The regulation by its terms is intended to apply to the project. *See* 310 C.M.R. § 7.38(1). In response the government argues at length that under Massachusetts law whatever retroactivity may be involved in applying the new regime to a previously planned but unbuilt portion of a project is permissible.

It is not entirely clear that the Sierra Club is making the argument attributed to it by the government. However this may be, the EPA did not suggest that its approval of the

**9.** The Clean Air Act requires a state to provide "necessary assurances" that it has authority under state law to carry out the implementation plan. 42 U.S.C. § 7410(a)(2)(E)(i).

regulation depended on how or whether it would be applied to existing projects; the EPA's notice of approval does not discuss retroactivity at all. There is no reason to suppose that the EPA's approval is at all dependent on the retroactivity issue. We have no need, in fact no warrant, to decide an issue that is not material either to the district court judgment nor to the validity of the EPA action that is the subject of the petition to review.

The judgment of the district court is *affirmed*. The petition for review is *denied*.