# United States Court of Appeals

## For the First Circuit

No. 04-2590
No. 05-1836

BOSTON EDISON COMPANY,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

───────────

CONCORD MUNICIPAL LIGHT PLANT,
WELLESLEY MUNICIPAL LIGHT PLANT,

Intervenors.

ON PETITION FOR REVIEW OF ORDERS OF
THE FEDERAL ENERGY REGULATORY COMMISSION

Before

Boudin, <u>Chief Judge</u>,

Stahl, <u>Senior Circuit Judge</u>,

and Lynch, <u>Circuit Judge</u>.

<u>Carmen L. Gentile</u> with whom <u>Bruder, Gentile & Marcoux, L.L.P.</u>, and <u>Mary E. Grover</u>, Assistant General Counsel, Legal Department, NSTAR Electric & Gas Corporation, were on consolidated brief for petitioner.
<u>Patrick Y. Lee</u> with whom <u>John S. Moot</u>, General Counsel, and <u>Robert H. Solomon</u>, Acting Solicitor, were on consolidated brief for respondent.
<u>J. Cathy Fogel</u> with whom <u>Robin E. Remis</u> and <u>Sullivan & Worcester LLP</u> were on consolidated brief for intervenor Concord Municipal Light Plant.

John P. Coyle with whom Paul M. Breakman and Duncan & Allen were on consolidated brief for intervenor Wellesley Municipal Light Plant.

March 20, 2006

**BOUDIN**, **Chief Judge**.  In a dispute with two of its Massachusetts customers, Boston Edison petitions for review of a decision of the Federal Energy Regulatory Commission ("FERC").  The customers are the municipal power departments of the towns of Concord and Wellesley (collectively, "the Towns").  The common question is whether Boston Edison is permitted to impose a particular transmission charge in delivering electrical power to the Towns.

Boston Edison is a Massachusetts utility which owns transmission facilities that are part of the New England power grid.  The grid is an interconnected network of transmission lines and stations in New England, owned by various utilities, which is the backbone network for distributing power within New England; it is controlled by an organization of utilities and others, including both Boston Edison and the Towns, called the New England Power Pool ("NEPOOL"), under the current version of the New England Power Pool Agreement ("NEPOOL Agreement").

The Towns own local distribution facilities by which they offer electricity to retail customers in their areas, using power generated by others and transmitted to the Towns over the New England power grid.  Boston Edison provides the transmission facilities that interconnect with the Towns' networks; for a number of years, the Towns also purchased their power from Boston Edison,

which charged negotiated "bundled" rates to encompass both the power and its delivery to the Towns' own networks.

The bundled rates covered use of two different classes of facilities: one set--the so-called PTF (Pool Transmission Facilities)--are the core backbone transmission facilities in the New England power grid as defined by the NEPOOL Agreement, which governs their use and charges for it; the other set, including local connections owned by Boston Edison, are called LNS (Local Network Service). To use Boston Edison's metaphor, PTF facilities are the electricity highway and LNS facilities are the access ramps connecting to the local streets, i.e., the Town networks.

The transmission and sale of power at wholesale is regulated by FERC. 16 U.S.C. § 824(a) (2000). In April 1980, Boston Edison and the Towns reached an agreement to settle rate disputes then pending before FERC and parallel federal law suits. The terms included the sale by Boston Edison (for a lump sum and annual payments) to the Towns of "use rights" in certain Boston Edison transmission facilities used in supplying power to the Towns;[1] a provision that the Towns thereafter would be "deemed to be [ ] 115 kV customer[s]"; and a further provision (Article IV):

_____

[1]The use rights, in each case, included the station facilities shown on the two schematics attached to this decision, namely, stations 416 and 342 for Concord and 292 and 110 for Wellesley. Stations 292 and 416 are non-PTF, stations 342 and 110 are PTF, and the lines between the two Concord and the two Wellesley stations are the so-called LNS lines at issue in this case.

-4-

> Concord or Wellesley may utilize for PTF
> transactions, as defined in the NEPOOL
> Agreement, their shares of the capacities of
> the [use rights facilities] . . . without
> payment of a PTF interconnection charge . . .
> .

Finally, Article IV imposed limits--not in issue here--on the quantities of power that could be acquired under the exemption.[2]

In effect, in exchange for specified payments, the Towns were given: (1) lower transmission rates afforded to high voltage (115 kV) customers (even though the town facilities were low voltage and normally paid more), and (2) exemption ("without payment of a PTF interconnection charge") from the payment of otherwise applicable charges for "interconnecting" the town-owned facilities with PTF. The scope of this exemption, as applied to present delivery arrangements, is the nub of the present controversy.

Pertinent to the dispute are further contracts, made in the 1990s, and yet to be described, between Boston Edison and the Towns. A further (and pivotal) event was the decision of the Towns, effective June 1, 2002, to purchase their power from another

---

[2]Article IV continues on to note: "provided that the total of the purchases under PTF transactions for each Town does not exceed its capacity in megavolt amperes of the facilities connected to PTF with respect to which the Town has made lump-sum payments." Concord's use rights are limited to 26 MVA of service. Wellesley's use rights are also limited, although the exact limitation is unclear (it purchased use rights in various amounts at several facilities), but neither Town disputes that PTF interconnection charges apply for any power over and above these amounts.

supplier (Constellation Power Services, Inc.) in place of Boston Edison, supplanting the bundled rates and requiring the "wheeling" of this power to the Towns over both PTF facilities and Boston Edison LNS facilities.

The charges for use of PTF for this wheeling service are fixed by the NEPOOL Agreement and are not in dispute. The disputed element is the use of Boston Edison LNS facilities for the hand-off from PTF to the Town networks. In the FERC proceeding now before us, the Towns urged that the language of Article IV ("without payment of a PTF interconnection charge") exempted their purchases from Constellation, up to specified maximum amounts of power (see note 2, above), from LNS charges that Boston Edison sought to impose to carry the power.

"Exemption" slightly overstates the issue. The NEPOOL Agreement as restated in 1997 provided that for participants "directly connected" to PTF, LNS charges would be phased down and ultimately eliminated over a six-year period ending in February of 2003. The position of the Towns is that for transactions after the phase-down they are contractually entitled to be treated as falling within this exempt category (while paying the phase-down rate for the period of 2002-2003).[3]

---

[3]Just how this concession as to 2002-2003 is to be squared with the unqualified "without payment of a PTF interconnection charge" language is never explained; but the period between the Towns' payment of bundled rates until June 2002 and the final phase-out of the LNS charges in August 2003 is only a year, the

-6-

After a six-month proceeding ending with a lengthy hearing, in August 2003 FERC's Administrative Law Judge ("ALJ") issued a thoughtful decision. Boston Edison Co., 104 F.E.R.C. ¶ 63,031 (2003). The decision glossed Article IV of the 1980 settlement agreement in light of intervening agreements, and the ALJ concluded that the Towns were contractually entitled to make their Constellation purchases without being subject to the LNS charges that Boston Edison sought. The Commission affirmed and denied rehearing. Boston Edison Co., 107 F.E.R.C. ¶ 61,248 (2004) (affirming); Boston Edison Co., 108 F.E.R.C. ¶ 61,276 (2004) (denying rehearing).

In this review proceeding, we are concerned primarily with issues of contract interpretation. Boston Edison concedes that under our precedents, FERC's views are "entitled to some deference in construing contracts," at least "where the sales are subject to FERC regulation," Boston Edison Co. v. Fed. Energy Regulatory Comm'n, 233 F.3d 60, 66 (1st Cir. 2000). In other words, the agency's interpretation must be reasonable, Boston Edison Co. v. Fed. Energy Regulatory Comm'n, 856 F.2d 361, 363 (1st Cir. 1988), but at the very least close calls tend to go its way. See Sierra Club v. Larson, 2 F.3d 462, 468-69 (1st Cir. 1993).

The dispute, both in front of FERC and in this court, begins with the 1980 agreement and, although its meaning is

Towns are not complaining, and we do not pursue the issue.

-7-

illuminated by subsequent agreements, the result is largely controlled by whatever reading is given to the original agreement. Recall that the 1980 agreement says that the Towns may use, for power obtained through PTF, "their shares of the capacities of the [use-rights facilities] . . . without payment of a PTF interconnection charge." What, then, is the "PTF interconnection charge" from which the Towns are exempted (up to the quantity limits elsewhere specified)?

Boston Edison argues that this language must refer only to charges covering the costs of the facilities in which the Towns purchased use rights. These facilities include Boston Edison station facilities and associated lines; but they do not include longer distance, non-PTF 115 kV lines also owned by Boston Edison that connect their nearby use-rights stations to other use-rights stations that are part of the main PTF grid. See note 1, above. So, says Boston Edison, it is entitled to charge the Towns for the use of the 115 kV lines under LNS tariffs.

The main language-based counter to this reading is the fact that _earlier_ provisions of the 1980 agreement already gave the Towns the right to use the use-rights facilities without payment of further charges for those facilities and also freed them from higher charges associated with connection of low-voltage lines. So, the ALJ reasoned, the Article IV interconnection charges exemption would be redundant unless it meant--as the Towns urge--

that they were to be treated as if they were connected to PTF facilities--i.e., exempt from LNS charges.

To a utilities lawyer, for whom it is gospel that customers pay costs associated with facilities that they use, 1 Kahn, The Economics of Regulation: Principles and Institutions 63 (1970), Boston Edison's reading would be attractive: the use rights in one set of facilities would not automatically carry over to allow what Boston Edison likes to call "free" use of other facilities. But the 1980 settlement was a compromise of many issues and resolved some in ways that may not be strictly cost-based, such as discontinuance of the higher charges for connection to low-voltage Town lines.

Boston Edison also relies on another provision of the 1980 agreement--Article VII--which addressed "transmission rates." Although at the time of the agreement the Towns apparently intended to continue purchasing considerable electricity from Boston Edison at rates that bundled power and transmission, Article VII addressed the contingency that the Towns might want to purchase power elsewhere to be wheeled by Boston Edison. Because the parties were unable to agree on such rates, Article VII provided that Boston Edison would file its proposed rates and the Towns could contest them under the statute.

From Article VII, Boston Edison infers that Article IV could not have been intended as a constraint on its transmission

rates. While Articles IV and VII can certainly take meaning from one another, see Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995), Boston Edison's inference is a non sequitur. That Boston Edison transmission rates as a whole might be subject to filing and protest did not prevent Boston Edison from binding itself as to one element, namely, waiving any charge for LNS lines as to power purchases up to a maximum limit on the quantity of power thus exempted.

Finally, Boston Edison emphasizes that the 1997 Restated NEPOOL Agreement phases out LNS charges for customers "directly connected" to PTF; by contrast, says Boston Edison, the Towns in this case are (with the irrelevant exception of station 148) directly connected only to non-PTF stations. But the thrust of the Towns' counter is that Article IV was designed to treat them as if they were directly connected to PTF.

Recognizing that both sides had arguments based on the wording of the 1980 agreement, the ALJ thought that the Towns' reading was reinforced by subsequent agreements between Boston Edison and the Towns: a 1993 agreement between Boston Edison and Concord, and agreements in 1992 and 1998 between Boston Edison and Wellesley. Assuredly, the subsequent understandings of the parties to a contract, like their actual practice following a contract, can cast light on their intentions as to the earlier agreement on which

subsequent agreements build.  See Reed & Reed, Inc. v. Weeks Marine, Inc., 431 F.3d 384, 388 (1st Cir. 2005).

The first of these subsequent agreements, the 1992 agreement with Wellesley, provided that Boston Edison would furnish Wellesley with all of its electricity requirements and contained language defining the delivery point as Boston Edison's "interconnections" with the town "under which [Wellesley] will be deemed to be a 115 kV customer at NEPOOL PTF ('Pool Transmission Facilities') including, but not limited, as set forth in Appendix B, page 2 of the 1980 Settlement Agreement."  Appendix B of the 1980 agreement describes the location, equipment, and capacities of the facilities in which Wellesley purchased use rights.

The ALJ took the "deemed to" language as reaffirming that Wellesley would be treated for rate purposes as if its facilities connected directly to PTF-in which event it would pay the PTF charges under the NEPOOL agreement but not additional Boston Edison LNS charges for the lines running from the shared use facilities to PTF.  Boston Edison Co., 104 F.E.R.C. ¶ 65,088.  This is not an inevitable reading, but it is at least a reasonable one.

Slightly more cryptic language in the 1998 agreement carried this concept forward.  This agreement was made as Boston Edison unbundled transmission from generation charges and, as to the former, provided that "[Wellesley] shall be able to utilize for PTF transactions and interconnection as defined in the NEPOOL

Agreement its share of the capacity of the facilities set forth in Appendix B."

Boston Edison admits that "the 1992 [agreement] defined the Wellesley 'delivery point' (i.e., the place at which electricity is delivered) as located on the PTF," but Boston Edison argues that because the 1992 agreement was terminated as of May 31, 2002, this definition is irrelevant to the current appeal. Yet the 1992 language still casts light on the intent of the 1980 agreement, which is in force, and, as it happens, the 1998 agreement contains similar language and is still in force today.

Boston Edison also argues that a provision of the 1998 agreement contains a clause freeing it to set transmission rates unilaterally, subject (as usual) to suspension and investigation by FERC. The clause dovetailed with an amendment to the 1992 agreement that terminated, as of 2002, the 1992 agreement fixing bundled rates, and the clause itself was to become effective "upon the termination of the 1992 agreement." But, as with Article VII discussed above, the entitlement to file rates does not mean that the rates are necessarily free of limitations imposed by existing agreements--here, the language quoted above pertaining to "PTF transactions and interconnection."

The situation with Concord is more complicated. In 1993, it signed an agreement with Boston Edison for the construction of new interconnection facilities, some to be owned by each party, to

replace the facilities in which Concord had bought use rights in 1980 (expanded by another agreement in 1985).  Boston Edison also bought back the 1980 (and 1985) use rights in the original facilities.  Boston Edison points to the buy-back as abrogating any rights premised on Concord's original purchase of use rights in 1980, even if the 1980 agreement were read in Concord's favor.  There is nothing wrong in arguing in the alternative, but the buy-back argument is not persuasive.

It is true that the new agreement provided that Concord's original use rights "cease[d]," but far from undercutting Concord's claim to an exemption from the LNS rates, the new agreement has language that carries forward existing rights and, even worse for Boston Edison, reinforces (by its specification of the rights) Concord's claim that the original 1980 agreement created a right of the breadth claimed by the Towns.  Specifically, Article 9.2 of the new agreement provided (the emphasis is ours):

> The Interconnection Facilities are intended to replace 13.8 kV facilities that connect the [Concord] system to the Edison transmission system and to the New England transmission grid.  In the event [Concord] is no longer receiving Full Requirements Service from Edison as defined in the 1993 Power Agreement, [Concord] may purchase from Pool-Planned Units, in which case under current NEPOOL rules [Concord] would pay [high- and low-voltage] PTF charges billed by NEPOOL. _Since the facilities between Station 342 and Station 416 are not considered PTF facilities by NEPOOL, the wheeling of these purchases from Station 342 through Station 416 could be subject to a radial transmission charge when_

-13-

> these purchases exceed 26 MVA, the level of
> transmission use rights purchased in the 1980
> Settlement Agreement. For purchases up to 26
> MVA, for [Concord], Station 416 will be
> treated as a PTF Facility for [Concord's]
> obtaining electric power.
>
> Purchases may be made by [Concord] from units
> other than Pool-Planned Units or from any
> other source, in which case those purchases
> shall be wheeled by Edison under its FERC-
> approved Firm Transmission or Non-Firm
> Transmission tariffs or successor transmission
> arrangements for its system, so long as such
> arrangements have received the required
> regulatory approvals.

The ALJ read the emphasized language as reflecting a Boston Edison concession that, notwithstanding the existence of LNS lines running from the grid toward Concord, the later interconnection point at which Concord planned to acquire power from Boston Edison would be treated as if it were a PTF point, thereby exempting it (up to 26 MVA) from separate LNS charges. The juxtaposition of the "could be" language with the "will be treated" language seemingly ties the 1980 exemption directly to the 115 kV lines.

Boston Edison concedes in its brief that "Article 9.2 . . . exempts Concord from 115 kV non-PTF charges for the first 26 MVA of [pool-planned unit] purchases," a concession hardly helpful to its reading of the 1980 agreement. However, it responds that the second paragraph of Article 9.2 quoted above governs non-pool planned unit purchases, that Constellation units fall into this

category, and that no exemption from LNS charges is provided for such purchases.

We agree that the language is unclear, but the ALJ read it Concord's way. Explaining the 1993 agreement's more elaborate discussion of pool-planned units, he said that in 1993 they were the only purchases Concord might take from the grid in place of Boston Edison power. He also underscored the lack of any explanation from Boston Edison as to why pool-planned units would be specially exempted. Boston Edison says on appeal that it is not required to "show motivation" to support plain language, but we think the language less plain than it does.

In particular, most of the underscored language quoted above was apparently added at Concord's insistence late in the day, and its placement may not be so significant. It is also possible to read the exempting language as stating a general principle applicable to unbundled purchases, regardless of whether they are from pool-planned units, and to explain the separate second paragraph as concerned primarily with confirming Boston Edison's obligation to wheel power from sources other than pool-planned units within the grid.

In the end, Boston Edison's best argument may be one not rooted in the language of any agreement. It says that the Towns were charged for the cost of the LNS lines when they received bundled service because that cost was built into the bundled rates.

-15-

Why, says Boston Edison, would it agree not to charge customers for such facilities (in accordance, we note, with usual utility practice, see Kahn, supra) after unbundling merely because those customers bought use rights in other facilities connected to PTF by the LNS lines?

The Towns say that the bundled rates were negotiated rather than cost-based rates and did not have a separate element for LNS; but this is something less than a claim that the LNS costs were not in fact covered by the bundled rates. A better answer might be that, in the compromises effected by the 1980 agreement, there is nothing that prevented Boston Edison from conceding something unusual as part of an overall settlement. This is apparently what the Commission found to have happened.

Granting due deference to the Commission, we see no basis for overturning its reading of the 1980 settlement in favor of the Towns. On the contrary, that contract (and those that followed) is couched in language that is cryptic, technical and dependent on unexplained physical and institutional arrangements within the power industry. The obscurity of the materials, and the need for expertise, are reasons why deference is accorded to the views of the expert agency. Sierra Club, 2 F.3d at 469.

Petitioners who trouble to unravel the technicalities and educate judges can go far to level the playing field. Here, granting that the original 1980 reference to "interconnection

charges" was obscure, Boston Edison has done little to dispel the adverse inferences contained in language in the 1992 Wellesley agreement and the 1993 Concord agreement that we have quoted and analyzed above. By contrast, the ALJ's balanced and lucid treatment inspires a measure of confidence in his result.

The ALJ was himself concerned that the Towns might be escaping any responsibility for LNS costs actually borne by Boston Edison and, even more important, costs that might burden other customers of Boston Edison. He said that the Commission had power, not invoked here by Boston Edison, to override contracts where they produced unjust results. See 16 U.S.C. § 824e(a). There is no point in adding our own conjectures, but the present decision may not be the last chapter in this story.

The petition for review is denied.

# WMLP/BECo Interconnections



Sta. 110 PTF

Line 292-522

BECo 115 kV non-PTF lines

Line 292-523

2 BECo lines (normally open)
WMLP use rights 9.0/10.66 MVA

Sta. 292 non-PTF 56 MVA

6 - WMLP distribution lines
65.9/72.0 MVA

| | |
|---|---|
| —— | WMLP Owned Facilities |
| —— | BECo Owned PTF Facilities |
| —— | WMLP Use Rights in BECo Facilities |

Sta. 148 PTF

3 BECo lines/breakers
WMLP use rights 23.5/26.3 MVA

Transformers 110A and 110B*
WMLP use rights 20.7/24.84 MVA

*Existing Use Rights capacity in Transformers 110A and 110B is based on data supplied by BECo. In June 2002, BECo replaced Transformer 110B with a higher rated transformer, thus increasing the capacity of Station 148. WMLP is entitled by contract to acquire Use Rights in the added transformation capcity. To date, BECo has not informed WMLP of the seasonal ratings of the new transformer.

Wellesley Municipal Light Plant

Sta. 433 PTF

WMLP use rights 2.94/3.27 MVA

-18-



- 115 kV Non PTF Facilities
- BECo PTF Facilities
- Concord Use-Rights Facilities
- BECo owned Concord IA Facilities