N.R. SMITH, Circuit Judge,
concurring in part and dissenting in part:
Though I agree with the majority opinion that § 209(e)(1) of the Clean Air Act (“Act”), 42 U.S.C. § 7410 et seq., does not preempt Rule 9510 promulgated by the San Joaquin Valley Unified Air Pollution Control District (“District”), I respectfully dissent from Parts IV and V. In my view, Rule 9510 is preempted by § 209(e)(2) of Act because (1) the regulation does not qualify as an “indirect source review program” under § 110(a)(5), since it directly regulates construction equipment (which are direct emissions sources); and (2) the regulation creates an emissions control “standard” for construction equipment that has not been approved by the Environmental Protection Agency (“EPA”).
*741 I.
The Act authorizes state regulatory-agencies to adopt local “implementation plans” to effectuate national air standards set by the EPA. Id. § 7410(a). As a general matter, states regulate stationary sources of pollution while the EPA regulates mobile sources of pollution. See Engine Mfrs. Ass’n v. EPA, 88 F.3d 1075, 1078-80 (D.C.Cir.1996).
Pursuant to § 110(a)(5) of the Act, the District adopted Rule 9510, which addresses “indirect sources” of pollution that do not fit clearly into the categories of stationary or mobile sources. See Sierra Club v. Larson, 2 F.3d 462, 467 (1st Cir.1993). An “indirect source review program” is “the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution” that would contribute to the exceedance of national air quality standards. 42 U.S.C. § 7410(a)(5)(D).
The Act defines an “indirect source” as a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply.... Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.
Id. § 7410(a)(5)(C) (emphasis added).
Absent EPA approval, the District is prohibited from “adopt[ing] and enforcing] standards and other requirements relating to the control of emissions” from “any nonroad vehicles or engines,” other than certain new vehicles and engines referred to in section 209(e)(1). 42 U.S.C. § 7543(e). Any standard relating to the control of nonroad vehicle emissions that the EPA has not authorized is impliedly preempted by section 209(e)(2). Pac. Merch. Shipping Ass’n v. Goldstene, 517 F.3d 1108, 1113 (9th Cir.2008).
As it relates to this case, Rule 9510 requires developers, applying for certain construction permits, to create an “air impact assessment” using an approved computer model to determine how much Nitrous Oxide (“NOx”) and particulate matter under 10 microns in diameter (“PM10”) the developer’s “construction equipment” would ordinarily produce. The computer model measures the baseline level of emissions by assessing the emissions that average California construction equipment would emit if it were used to complete the development.
From this baseline calculation, Rule 9510 requires that “exhaust emissions for construction equipment greater than [50] horsepower used or associated with the development project” be reduced by 20 percent for NOx emissions and by 45 percent for PM10 emissions. If the developer cannot meet the reductions, he must find alternative means of compliance or pay a fine.
II.
Reasoning that Rule 9510 does not target direct sources apart from its regulation of a development site as a whole, the majority holds that the “plain language” of the Act affirmatively authorizes Rule 9510 as an “indirect source review program.” Maj. Op. at 737. I disagree.
Though an indirect source review program can certainly regulate direct emission sources incident to a broader regulatory scheme, Rule 9510 facially targets *742 direct sources by limiting the emissions of construction equipment separate from its regulation of development sites. The “General Mitigation Requirements” under Rule 9510 provide separate NOx and PM10 emission reduction standards for (1) “construction equipment greater than fifty (50) horsepower used or associated with the development project” during construction, Rule 9510 § 6.1.1.1 (emphasis added); and (2) “the project’s operational baseline” during ongoing operations, id. § 6.2 (emphasis added). Thus, Rule 9510 treats emissions from “construction equipment” — rather than all emissions from a development site as a whole — as the relevant unit of regulation during the initial phases of development.
Further, the Act unequivocally provides that “[djireet emission sources ... at, within, or associated with, any indirect source shall not be deemed indirect sources....” 42 U.S.C. § 7410(a)(5)(C). If this provision has any meaning at all, it mandates that states cannot isolate direct emissions sources associated with an indirect source and deem them “indirect sources” subject to special regulation apart from the indirect source in the aggregate. Yet, this is precisely what Rule 9510 does — construction vehicles (direct emissions sources) are a subset of the “project” site (the indirect source). Construction vehicles do not fit the definition of an indirect source — “a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution,” id.- — so they cannot be regulated apart from the development project as a whole.[1]
The majority defends the Rule by arguing that the “baseline” and reduced emissions standards are calculated in terms of the development as a whole. But this ignores the fact that the reduced emissions standard is then imposed exclusively on “construction equipment” — not on the “site” or “development project.” Regardless of how the standard is calculated, the Act plainly proscribes regulation of direct emission sources apart from indirect sources. The only part of Rule 9510 that applies an emissions standard to “the project,” as a whole, is section 6.2, which regulates ongoing “project” emissions. But even if section 6.2, standing alone, could qualify as an indirect source review program, section 6.1.1.1 clearly does not.
Similarly, it makes no difference that the Rule applies only to “certain kinds of developments, rather than to certain kinds of construction equipment.” Maj. Op. at 737. There are no exceptions to 42 U.S.C. § 7410(a)(5)(C) in the Act for programs that limit the universe of regulatory possibilities to only certain kinds of development projects. The bottom line is that the exhaust emissions of construction equipment on a development site that is subject to Rule 9510 will be isolated and separately regulated in violation of § 7410(a)(5)(C)’s “direct emissions sources” proviso. I agree that a development site — in contrast to a fleet of construction equipment at a development site- — qualifies as an indirect source under § 7410(a)(5)(C). But, by imposing emissions reduction standards separately on construction equipment located on that site, Rule 9510 does exactly what the Act proscribes — regulate direct sources by deeming them indirect sources.
III.
The Act also preempts Rule 9510, because the Rule creates an emissions con *743 trol “standard” that has not been approved by the EPA.[2] As the majority acknowledges, section 209(e)(2) creates a zone of implied preemption for “standards and other requirements relating to the control of emissions” from “any nonroad vehicles or engines.” Pacific Merchant, 517 F.3d at 1113 (9th Cir.2008).
In Engine Manufacturers Ass’n v. South Coast Air Quality Management District, 541 U.S. 246, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004), the Supreme Court held that the Clean Air Act preempted a local rule requiring certain fleet operators — e.g., street sweepers, airport taxicabs, and solid waste collectors, among others — to purchase or lease designated low-emissions vehicles when adding or replacing vehicles in their fleets. 541 U.S. at 249-55, 124 S.Ct. 1756. Since the federal government alone may establish specific emissions standards for particular vehicles, the local rule could not establish a “standard” requiring fleet operators to buy vehicles with certain emissions characteristics. The Court explained that a “standard,” for purposes of the Act, is that which requires a “vehicle or engine” not to “emit more than a certain amount of a given pollutant, ... be equipped with a certain type of pollution-control device, or ... have some other design feature related to the control of emissions.” Id. at 253, 124 S.Ct. 1756. In Pacific Merchant, we later held that a California regulation requiring marine vessels not to use auxiliary diesel engines “which emit levels of diesel PM, NOx, and SOx in exceedance of [specified] emission rates” established a “standard” under the definition articulated in South Coast. 517 F.3d at 1114 (internal quotations and alterations omitted).
No meaningful distinction exists between the regulations at issue in South Coast and Pacific Merchant, and Rule 9510. Like the regulation in Pacific Merchant, Rule 9510 fixes an ascertainable limit on vehicle or engine emissions. While the former required emissions “not to exceed [rates] ... that would result had the engine used [certain specified] fuels,” Pacific Merchant, 517 F.3d at 1112, (internal quotations omitted), the latter requires emissions not to exceed a rate calculated by subtracting certain reduction targets from the statewide average emissions rate.
Further, Rule 9510 requires emissions reductions specifically from vehicles or engines falling within their regulatory purview — not from a variety of emissions sources traditionally associated with “indirect sources.”[3] Just as the regulation in Pacific Merchant affected any auxiliary diesel engine on an ocean-going vessel within twenty-four miles of California’s coast, 517 F.3d at 1109, Rule 9510 specifically affects construction equipment over 50 horsepower located on or associated *744 with a regulated development site. The majority ignores the plain language of Rule 9510 in concluding otherwise — in its view, the Rule “does not target vehicles or engines. It requires emissions reductions, from a development site as a whole.” Maj. Op. at 739. Yet, section 6.1.1.1 unequivocally requires a reduction in “exhaust emissions for construction equipment ... used or associated with [a] development project.” The applicable unit of regulation here is the fleet of vehicles rather than the “site.”
It makes no difference that the regulation in Pacific Merchant dealt with individual engines while Rule 9510 regulates fleets of vehicles. There are no limiting caveats in either Pacific Merchant or South Coast that would permit a state regulator to do to a small group of vehicles what it could not do to a single vehicle. Indeed, the regulation struck down in South Coast for establishing a “standard” under section 209 regulated fleets of vehicles.
Moreover, Rule 9510 effectively regulates construction vehicles individually. Since the permitted emission rate under section 6.1.1.1 is not divided among a variety emissions sources at the development site — as it would be had it targeted aggregate project emissions — this section of the Rule affects only “construction vehicles.” Sections 6.1.1.1 and 6.1.1.2 then impose maximum emission standards calculated as a percentage of average construction emission rates in California. Because the estimation model accounts for “the numbers and types of construction equipment that will be used,” the reduction standard necessarily affects every vehicle involved in the development project.
Lastly, the notion that states can regulate fleets of vehicles also runs afoul of the entire Clean Air Act regime. From the Act’s inception, Congress has delegated regulation of stationary emissions sources to the states, while reserving (since the late 1960s) regulation of mobile emissions sources to federal province.[4] Engine Mfrs. Ass’n, 88 F.3d at 1079-80. Indeed, Congress explicitly preempted state regulation of mobile emissions sources when “the possibility of 50 different state regulatory regimes ‘raised the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers.’ ” Motor & Equip. Mfrs, 627 F.2d at 1109 (citation omitted).
Though Congress delegated additional regulatory authority to states over “indirect sources” that fit into neither the stationary nor mobile categories, see Sierra Club, 2 F.3d at 467, it did not upset its longstanding policy of setting only national standards for mobile emissions sources like construction equipment. Had Congress intended to delegate its authority to regulate mobile emitters, it could have said so. The Act defines “indirect sources” by their very propensity to “attract ... mobile sources of pollution.” Yet, nowhere do I find authority to regulate those mobile sources directly — that is, apart from an indirect source. Quite the contrary, Congress prohibited states from “adopting] and enforcing] standards and other requirements relating to the control of emissions” from “any nonroad vehicles or engines,” other than certain vehicles referred to in section 209(e)(1). 42 U.S.C. § 7543(e). It also exempted “direct sources” (a much broader category of *745 emitters) from the purview of state indirect source review programs. Id. § 7410(a)(5)(C). Because large construction vehicles are both “nonroad vehicles” and “direct sources,” Rule 9510 squarely contradicts the structure and express provisions of the Clean Air Act.

. If Rule 9510 § 6.1.1.1 simply provided for the regulation of “the exhaust emissions ¡from the development project 1," rather than from “construction equipment greater than fifty (50) horsepower used or associated with the development project,” I would find no problem with the regulation.

. The EPA is currently reviewing Rule 9510, but has not yet taken final action to approve or disapprove the regulation. See Approval and Promulgation of Implementation Plans: 1-Hour Ozone Extreme Area Plan for San Joaquin Valley, CA, 74 Fed.Reg. 33,933, 33,937 tbl. 2 (July 14, 2009). A decision from the EPA would render our review unnecessary. As such, I would have preferred to allow that federal agency (tasked with managing indirect source review programs) to determine whether Rule 9510 comports with the relevant provisions of the Act before deciding this appeal.

. I reiterate that "indirect sources” include facilities, structures, real property, roads, and even parking lots that attract mobile sources of pollution, but are not themselves mobile or direct emissions sources. 42 U.S.C. § 7410(a)(5)(C). While an indirect source such as a construction site would ordinarily include a variety of direct emissions sources— large and small nonroad construction equipment, temporary or permanent facilities, generators, road vehicles, etc. — the statute only provides for their regulation in the aggregate.

. Only California is permitted to promulgate its own emissions standards for mobile sources under certain circumstances, but Rule 9510 was not promulgated pursuant to this authority. See Motor & Equip. Mfrs. Ass’n, Inc. v. EPA, 627 F.2d 1095, 1109 n. 26 (D.C.Cir.1979).